**Slip Op. 02-61**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: SENIOR JUDGE NICHOLAS TSOUCALAS

```
_____
                                        :
NSK LTD. and NSK CORPORATION;           :
NTN CORPORATION,                        :
NTN BEARING CORPORATION OF AMERICA,     :
AMERICAN NTN BEARING                    :
MANUFACTURING CORPORATION,              :
NTN DRIVESHAFT, INC. and                :
NTN-BOWER CORPORATION; and              :
THE TORRINGTON COMPANY,                 :
                                        :
          Plaintiffs and               :    Consol. Court No.
          Defendant-Intervenors,       :    98-07-02527
                                        :
          v.                            :
                                        :
UNITED STATES,                          :
                                        :
          Defendant,                    :
                                        :
KOYO SEIKO CO., LTD. and                :
KOYO CORPORATIONS OF U.S.A.; and        :
NACHI-FUJIKOSHI CORP.,                  :
NACHI AMERICA, INC. and                 :
NACHI TECHNOLOGY, INC.,                 :
                                        :
          Defendant-Intervenors.        :
_____:
```

Plaintiffs and defendant-intervenors, NSK Ltd. and NSK Corporation (collectively "NSK"), NTN Corporation, NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corporation, NTN Driveshaft, Inc. and NTN-Bower Corporation (collectively "NTN"), and The Torrington Company ("Torrington"), move pursuant to USCIT R. 56.2 for judgment upon the agency record challenging various aspects of the Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled <u>Final Results of Antidumping Duty Administrative Reviews of Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden, and the United Kingdom</u> ("<u>Final Results</u>"), 63 Fed. Reg. 33,320 (June 18, 1998), for the period of

review ("POR") from May 1, 1996, through April 30, 1997.

Specifically, NSK argues that Commerce erred in: (1) calculating the constructed value profit by (a) excluding below-cost sales, and (b) applying Commerce's methodology; (2) denying partial level-of-trade adjustment; and (3) treating repacking expenses in the United States as direct selling expenses.

NTN maintains that Commerce erred in: (1) denying an adjustment to indirect selling expenses for interest incurred in financing cash deposits for antidumping duties; (2) including sample transactions for which no compensation was received; (3) refusing to exclude home market sales with high profits and home market sample sales from the dumping margin calculation; (4) disregarding sales to affiliated customers in Commerce's calculation of normal value; (5) using the affiliated supplier's cost of production for inputs in those cases when the cost was higher than the transfer price in Commerce's calculation of cost of production and constructed value; (6) recalculating indirect selling expenses incurred in the United States without regard to levels of trade; (7) recalculating normal value based on sales of identical or similar merchandise before resorting to constructed value in instances where below-cost sales were disregarded; (8) disallowing a claim for level-of-trade adjustment; (9) calculating constructed export price profit without regard to levels of trade; (10) including profits from export price sales in Commerce's calculation of constructed export price profit; and (11) recalculating home market indirect selling expenses without regard to levels of trade.

Finally, Torrington asserts that Commerce erred in: (1) accepting, as a direct adjustment to price, Koyo Seiko Co. and Koyo Corporations of U.S.A.'s (collectively "Koyo") (a) home market lump sum billing adjustment, and (b) rebates; (2) accepting, as a direct adjustment to price, NSK's home market billing adjustment; and (3) accepting, as a direct adjustment to price, NTN's home market discounts.

**Held:** NSK's motion for judgment on the agency record is granted in part and denied in part. NTN's motion for judgment on the agency record is granted in part and denied in part. Torrington's motion for judgment on the agency record is denied. Case is remanded to Commerce: (1) to determine whether NSK's cylindrical roller bearings at issue are (a) complex merchandise that encompasses characteristics so numerous that the process of valuation shall be entrusted to Commerce's discretion, or (b) merchandise that can be matched in accordance with the statutorily

provided hierarchy; and (c) if Commerce concludes that NSK's cylindrical roller bearings are merchandise that could be matched in accordance with the statutorily provided hierarchy, change <u>Final Results</u>, 63 Fed. Reg. 33,320, accordingly; and (2) with regard to NTN's minor inputs, to (a) either provide the Court with a sufficient and reasonable explanation of Commerce's methodology; or (b) if Commerce is unable to do so, amend <u>Final Results</u>, 63 Fed. Reg. 33,320, accordingly.

[NSK's motion for judgment on the agency record is granted in part and denied in part. NTN's motion for judgment on the agency record is granted in part and denied in part. Torrington's motion for judgment on the agency record is denied. Case remanded.]

Dated: July 8, 2002

<u>Lipstein, Jaffe & Lawson, L.L.P.</u> (<u>Robert A. Lipstein</u>, <u>Matthew P. Jaffe</u> and <u>Grace W. Lawson</u>) for NSK, plaintiff and defendant-intervenor.

<u>Barnes, Richardson & Colburn</u> (<u>Donald J. Unger</u>, <u>Kazumune V. Kano</u>, <u>Christine H. T. Yang</u> and <u>Clarice K. M. McCauley</u>) for NTN, plaintiff and defendant-intervenor.

<u>Stewart and Stewart</u> (<u>Terence P. Stewart</u>, <u>Geert De Prest</u> and <u>Lane S. Hurewitz</u>) for Torrington, plaintiff and defendant-intervenor.

<u>Robert D. McCallum, Jr.</u>, Assistant Attorney General; <u>David M. Cohen</u>, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (<u>Velta A. Melnbrencis</u>, Assistant Director); of counsel: <u>Patrick V. Gallagher</u>, <u>Myles S. Getlan</u>, <u>John F. Koeppen</u> and <u>David R. Mason</u>, Office of the Chief Counsel for Import Administration, United States Department of Commerce, for the United States, defendant.

<u>Powell, Goldstein, Frazer & Murphy LLP</u> (<u>Neil R. Ellis</u> and <u>Elizabeth C. Hafner</u>) for Koyo, defendant-intervenor.

<u>O'Melveny & Myers LLP</u>, (<u>Greyson L. Bryan</u> and <u>Michael A. Meyer</u>) for Nachi, defendant-intervenor.

## OPINION

**TSOUCALAS, Senior Judge:**        Plaintiffs and defendant-intervenors, NSK Ltd. and NSK Corporation (collectively "NSK"), NTN Corporation, NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corporation, NTN Driveshaft, Inc. and NTN-Bower Corporation (collectively "NTN"), and The Torrington Company ("Torrington"), move pursuant to USCIT R. 56.2 for judgment upon the agency record challenging various aspects of the Department of Commerce, International Trade Administration's ("Commerce") final determination, entitled <u>Final Results of Antidumping Duty Administrative Reviews of Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden, and the United Kingdom</u> ("<u>Final Results</u>"), 63 Fed. Reg. 33,320 (June 18, 1998), for the period of review ("POR") from May 1, 1996, through April 30, 1997.

Specifically, NSK argues that Commerce erred in: (1) calculating the constructed value profit by (a) excluding below-cost sales, and (b) applying Commerce's methodology; (2) denying partial level-of-trade adjustment; and (3) treating repacking expenses in the United States as direct selling expenses.

NTN maintains that Commerce erred in: (1) denying an adjustment to indirect selling expenses for interest incurred in financing cash deposits for antidumping duties; (2) including

sample transactions for which no compensation was received; (3) refusing to exclude home market sales with high profits and home market sample sales from the dumping margin calculation; (4) disregarding sales to affiliated customers in Commerce's calculation of normal value; (5) using the affiliated supplier's cost of production for inputs in those cases when the cost was higher than the transfer price in Commerce's calculation of cost of production and constructed value; (6) recalculating indirect selling expenses incurred in the United States without regard to levels of trade; (7) recalculating normal value based on sales of identical or similar merchandise before resorting to constructed value in instances where below-cost sales were disregarded; (8) disallowing a claim for level-of-trade adjustment; (9) calculating constructed export price profit without regard to levels of trade; (10) including profits from export price sales in Commerce's calculation of constructed export price profit; and (11) recalculating home market indirect selling expenses without regard to levels of trade.

Finally, Torrington asserts that Commerce erred in: (1) accepting, as a direct adjustment to price, Koyo Seiko Co. and Koyo Corporations of U.S.A.'s (collectively "Koyo") (a) home market lump sum billing adjustment, and (b) rebates; (2) accepting, as a direct adjustment to price, NSK's home market billing adjustment; and (3)

accepting, as a direct adjustment to price, NTN's home market discounts.

## BACKGROUND

The administrative review at issue covers the period of review from May 1, 1996, through April 30, 1997.[1]  Commerce published the preliminary results of the subject review on February 9, 1998.  <u>See Notice of preliminary results of antidumping duty administrative reviews and partial termination of administrative reviews of Antifriction Bearings (Other Than Tapered Roller Bearings) And Parts Thereof From France, Germany, Italy, Japan, Romania, Singapore, Sweden, and The United Kingdom</u> ("<u>Preliminary Results</u>"), 63 Fed. Reg. 6512.  On June 18, 1998, Commerce published the <u>Final Results</u> at issue.  <u>See</u> 63 Fed. Reg. 33,320.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 19 U.S.C. § 1516a(a) (1994) and 28 U.S.C. § 1581(c) (1994).

---

[1] Since the administrative review at issue was initiated after January 1, 1995, the applicable law is the antidumping statute as amended by the Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994).  <u>See</u> <u>Torrington Co. v. United States</u>, 68 F.3d 1347, 1352 (Fed. Cir. 1995).

**STANDARD OF REVIEW**

In reviewing a challenge to Commerce's final determination in an antidumping administrative review, the Court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law . . . ."  19 U.S.C. § 1516a(b)(1)(B)(i) (1994).

I.   SUBSTANTIAL EVIDENCE TEST

Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966) (citations omitted).  Moreover, "[t]he court may not substitute its judgment for that of the [agency] when the choice is 'between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'"  American Spring Wire Corp. v. United States, 8 CIT 20, 22, 590 F. Supp. 1273, 1276 (1984) (quoting Penntech Papers, Inc. v. NLRB, 706 F.2d 18, 22-23 (1st Cir. 1983) (quoting, in turn,

<u>Universal Camera</u>, 340 U.S. at 488)).


**II.  CHEVRON TWO-STEP ANALYSIS**

To determine whether Commerce's interpretation and application
of the antidumping statute is "in accordance with law," the Court
must undertake the two-step analysis prescribed by <u>Chevron U.S.A.</u>
<u>Inc. v. Natural Resources Defense Council, Inc.</u> ("<u>Chevron</u>"), 467
U.S. 837 (1984).   Under the first step, the Court reviews
Commerce's construction of a statutory provision to determine
whether "Congress has directly spoken to the precise question at
issue."   <u>Id.</u> at 842.   "To ascertain whether Congress had an
intention on the precise question at issue, [the Court] employ[s]
the 'traditional tools of statutory construction.'"   <u>Timex V.I.,</u>
<u>Inc. v. United States</u>, 157 F.3d 879, 882 (Fed. Cir. 1998) (citing
<u>Chevron</u>, 467 U.S. at 843 n.9).   "The first and foremost 'tool' to
be used is the statute's text, giving it its plain meaning.
Because a statute's text is Congress's final expression of its
intent, if the text answers the question, that is the end of the
matter."   <u>Id.</u> (citations omitted).   Beyond the statute's text, the
tools of statutory construction "include the statute's structure,
canons of statutory construction, and legislative history."   <u>Id.</u>
(citations omitted); <u>but see</u> <u>Floral Trade Council v. United States</u>,
23 CIT 20, 22 n.6, 41 F. Supp. 2d 319, 323 n.6 (1999) (noting that
"[n]ot all rules of statutory construction rise to the level of a

canon, however." Citation omitted).

If, after employing the first prong of <u>Chevron</u>, the Court determines that the statute is silent or ambiguous with respect to the specific issue, the question for the Court becomes whether Commerce's construction of the statute is permissible. <u>See</u> <u>Chevron</u>, 467 U.S. at 843. Essentially, this is an inquiry into the reasonableness of Commerce's interpretation. <u>See</u> <u>Fujitsu Gen. Ltd.</u> <u>v. United States</u>, 88 F.3d 1034, 1038 (Fed. Cir. 1996). Provided Commerce has acted rationally, the Court may not substitute its judgment for the agency's. <u>See</u> <u>Koyo Seiko Co. v. United States</u>, 36 F.3d 1565, 1570 (Fed. Cir. 1994) (holding that "a court must defer to an agency's reasonable interpretation of a statute even if the court might have preferred another"); <u>see also</u> <u>IPSCO, Inc. v.</u> <u>United States</u>, 965 F.2d 1056, 1061 (Fed. Cir. 1992). The "[C]ourt will sustain the determination if it is reasonable and supported by the record as a whole, including whatever fairly detracts from the substantiality of the evidence." <u>Negev Phosphates, Ltd. v. United</u> <u>States</u>, 12 CIT 1074, 1077, 699 F. Supp. 938, 942 (1988) (citations omitted). In determining whether Commerce's interpretation is reasonable, the Court considers the following non-exclusive list of factors: the express terms of the provisions at issue, the objectives of those provisions and the objectives of the antidumping scheme as a whole. <u>See</u> <u>Mitsubishi Heavy Indus. v.</u>

United States, 22 CIT 541, 545, 15 F. Supp. 2d 807, 813 (1998).

**DISCUSSION**

**I.    Commerce's Calculation of Profit for Constructed Value**

    **A.    BACKGROUND**

The enactment of the URAA, which governs the case at bar,
introduced a number of changes in the antidumping law.
Specifically, the constructed value ("CV") provisions relating to
profit determination were altered to provide for: (1) a preferable
method based upon the actual amounts incurred and realized by the
particular party being reviewed, see 19 U.S.C. § 1677b(e)(2)(A)
(1994); and (2) alternative methods that are to be used when actual
data are not available.  See  19 U.S.C. § 1677b(e)(2)(B) (1994).
Specifically, Commerce is to rely in its calculations on

> the actual amounts incurred and realized by the specific
> exporter or producer being examined in the . . . review
> for . . . profits, in connection with the production and
> sale of a foreign like product, in the ordinary course of
> trade, for consumption in the foreign country, [unless,]
> if the actual data are not available with respect to
> the[se] amounts . . . , then [Commerce is to rely  in its
> calculations on: (1)] . . . the actual amounts incurred
> and realized by the specific exporter or producer being
> examined in the . . . review for . . . profits, in
> connection with the production and sale [of a foreign
> like product], for consumption in the foreign country, of
> merchandise that is in the same general category of
> products as the subject merchandise[; (2)] the weighted
> average of the actual amounts incurred and realized by
> exporters or producers that are subject to the . . .
> review (other than the exporter or producer described in
> clause [(1)]) for . . . profits, in connection with the
> production and sale of a foreign like product, in the

ordinary course of trade, for consumption in the foreign
country[;] or [(3)] the amounts incurred and realized for
. . . profits, based on any other reasonable method,
except that the amount allowed for profit may not exceed
the amount normally realized by exporters or producers
(other than the exporter or producer described in clause
[(1)] in connection with the sale, for consumption in the
foreign country, of merchandise that is in the same
general category of products as the subject merchandise
. . . .

19 U.S.C. § 1677b(e) (1994).


The URAA also amended the definition of the term "ordinary

course of trade" to provide that below-cost sales that Commerce

disregards in the determination of normal value ("NV") under 19

U.S.C. § 1677b(a) (1994) fall outside the "ordinary course of

trade." Generally,

[t]he term "ordinary course of trade" means the
conditions and practices which, for a reasonable time
prior to the exportation of the subject merchandise, have
been normal in the trade under consideration with respect
to merchandise of the same class or kind. [Commerce]
shall consider the following sales and transactions,
among others, to be outside the ordinary course of trade:
. . . [s]ales disregarded under [19 U.S.C. §] 1677b(b)(1)
[(1994)] . . . .

19 U.S.C. § 1677(15) (1994).


Section 1677b(b)(1) provides, in turn, that certain below-cost

sales are to be disregarded in the determination of NV.

Specifically, it provides that

[if Commerce] determines that sales made at less than the
cost of production[] . . . have been made within an
extended period of time in substantial quantities, and
[such sales] were not at prices which permit recovery of

all costs within a reasonable period of time, such sales may be disregarded in the determination of [NV]. Whenever such sales are disregarded, [NV] shall be based on the remaining sales of the foreign[-]like product in the ordinary course of trade.  If no sales made in the ordinary course of trade remain, [NV] shall be based on [CV] of the merchandise.

19 U.S.C. § 1677b(b)(1) (1994).

Moreover, the Statement of Administrative Action ("SAA"), a document that represents an authoritative expression regarding the interpretation and application of the URAA for  purposes of United States domestic law, provides that 19 U.S.C. § 1677b(e)(2)(A)

establishes as a general rule that Commerce will base amounts for . . . profit only on amounts incurred and realized in connection with sales in the ordinary course of trade of the particular merchandise in question (foreign[-]like product). Commerce may ignore sales that it disregards as a basis for [NV], such as those disregarded because they are made at below-cost prices.

H.R. Doc. 103-316 at 839 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4175-76.

During the review at issue, Commerce, pursuant to 19 U.S.C. § 1677b(e)(2)(A): (1) excluded below-cost sales for the purposes of calculating CV profit; and (2) applied the "preferred method" for calculation of CV profit.  See Final Results, 63 Fed. Reg. at 33,333-34.

B.   CONTENTIONS OF THE PARTIES

Commerce maintains that it "properly excluded the below-cost sales that [were] disregarded in [the] determin[ation of] NV" because

> [i]t is clear from the statutory language that the use of all sales, including below-cost sales, would have been appropriate only if Commerce had, in fact, determined CV profit under the alternative methods provided in 19 U.S.C. § 1677b(e)(2)(B).   This is so because the preferred method [under 19 U.S.C. §] 1677b(e)(2)(A) requires that the determination be based upon the production and sale of a foreign[-]like product in the "ordinary course of trade" and the term "ordinary course of trade" excludes below-cost sales that have been disregarded in determining NV.

Def.'s Mem. Opp'n Pls.' Mot. J. Agency R. ("Def.'s Mem.") at 14-15 (relying on 19 U.S.C. §§ 1677(15) and 1677b(b)(1) and pointing out that only the alternative methods, unlike the preferred method, allow the determination of profit to be based on data other than the production and sale of a product in the "ordinary course of trade").

Responding to this statement by Commerce, NSK "abandon[ed] its claim that Commerce violated the antidumping law by calculating CV profit for ball bearings based on the entire database for above[-]cost sales," see [NSK's] Reply Mem. Supp. Mot. J. Agency R. ("NSK's Reply") at 1 (emphasis supplied), but asserts that Commerce must calculate CV profit for cylindrical roller bearings on a model or family basis when using the statutory preferred methodology.  See

id. Pointing to Commerce's statement that "'Section 1677(16) . . . establishes a descending hierarchy,'" NSK asserts that this proposition dispenses with Commerce's discretion and invalidates Commerce's assertion that "'[w]here[] . . . the subject merchandise is complex, . . . the foreign[-]like product typically embraces more than one of the categories established in [S]ection 1677(16), and Commerce's selection of a particular category will depend upon the particular circumstances.'" Id. at 2 (quoting Def.'s Mem. at 17). NSK maintains that Commerce

> must examine each . . . category in order [of statutorily provided preference] and, once merchandise is presented that meets the criteria stated by a category, use the profit of that merchandise to calculate CV profit.

Id.

Torrington supports Commerce's position and points out that Commerce's methodology was reasonable in view of the statutory mandate of the provisions involved. See Resp. Torrington, Def.-Intervenor, Rule 56.2 Mots. NSK and NTN, Pls. ("Torrington's Resp.") at 9-12.


### C. ANALYSIS

During the review at issue, Commerce applied the "preferred" method for calculating CV profit contained in 19 U.S.C. § 1677b(e)(2)(A). See Final Results, 63 Fed. Reg. at 33,333. Specifically, Commerce determined an actual profit ratio for each

respondent by: (1) first calculating for each respondent the profit
for each sale of the foreign-like product in the ordinary course of
trade by subtracting all costs and expenses from the home market
price; and then (2) aggregating the profit for all the respondent's
sales at the same level of trade ("LOT") and dividing this profit
by the respondent's aggregate total cost for the same sales. See
Preliminary Results, 63 Fed. Reg. at 6516.  In doing so, Commerce
relied on the fact that "foreign[-]like product" is defined in 19
U.S.C. § 1677(16) as

> merchandise in the first of the following categories in
> respect of which a determination . . . can be
> satisfactorily made: (A) [t]he subject merchandise and
> other merchandise which is identical in physical
> characteristics with, and was produced in the same
> country by the same person as, that merchandise[;] (B)
> [m]erchandise[] (i) produced in the same country and by
> the same person as the subject merchandise, (ii) like
> that merchandise in component material or materials and
> in the purposes for which used, and (iii) approximately
> equal in commercial value to that merchandise[;] (C)
> [m]erchandise[] (i) produced in the same country and by
> the same person and of the same general class or kind as
> the merchandise which is the subject of the
> investigation, (ii) like that merchandise in the purposes
> for which used, and (iii) which the administering
> authority determines may reasonably be compared with that
> merchandise.

19 U.S.C. § 1677(16) (emphasis supplied).

Section 1677(16), same as a corresponding pre-URAA Section 19
U.S.C. § 1677(16) (1988), establishes the approach for model
matching.  Specifically, Section 1677(16) first instructs Commerce
to conduct a comparison using merchandise that is identical in

physical characteristics.  If such comparison is not feasible, Commerce must look for merchandise that is like that merchandise in component materials and in the purposes for which used.  Finally, if neither identical nor like merchandise is available, Commerce must look for merchandise that is either: (1) produced in the same country and by the same person and of the same general class or kind as the merchandise which is the subject of the investigation; or (2) like that merchandise in the purposes for which it is used; or (3) which Commerce determines may reasonably be compared with that merchandise. See 19 U.S.C. § 1677(16)(C).  Therefore, Section 1677(16) establishes a descending hierarchy of preferential modes that Commerce must select for matching purposes. As Commerce correctly points out, the use of the term "determination" that "can be satisfactorily made" in the language of 19 U.S.C. § 1677(16)(C) indicates, however, that Commerce enjoys discretion in determining when to select a particular category of the foreign-like product. See Def.'s Mem. at 17.

Consequently, Commerce operated under an assumption that in the cases where

> the subject merchandise is complex, encompassing numerous characteristics [suitable] for matching [in accordance with different subcategories], the foreign[-]like product typically embraces more than one of the categories established in [S]ection 1677(16), [and, therefore] Commerce's selection of a particular category [should] depend upon the particular circumstances.

Id.


Thus, if either identical or similar merchandise is not available, merchandise of the "same general class or kind" as the subject merchandise could qualify as a foreign-like product.[2] Consequently, Commerce aggregated each respondent's profits for the foreign-like products sold in the ordinary course of trade, explaining that

> an aggregate calculation that encompasses all foreign like products under consideration for normal value represents a reasonable interpretation of [the pertinent] section . . . . Moreover, [Commerce] believe[s] that, in applying the preferred method for computing CV profit . . . , the use of aggregate data results in a reasonable and practical measure of profit that [Commerce] can apply consistently in each case. By contrast, a method based on varied groupings of foreign[-]like products, each defined by a minimum set of matching criteria shared with a particular model of the subject merchandise, would add an additional layer of complexity and uncertainty to

_____

[2] Commerce is correct in its observation that the reference to a "foreign-like" product in Section 1677b(e)(2)(A) does not amount to a manifestation of congressional intent that profit be calculated upon the basis of merchandise that is <u>identical</u> to the subject merchandise. <u>See</u> Def.'s Mem. at 18. By its nature, CV becomes available for determining NV only when identical or similar home market merchandise is not available for comparison with United States sales because there are no such home market sales or they were below-cost and, therefore, are disregarded. Thus, Congress could not have intended that Commerce limit the profit calculation under Section 1677b(e)(2)(A) to profit incurred in the production or sale of merchandise identical to the subject merchandise because, in that event, the "preferred" method provided in Section 1677b(e)(2)(A) would be applicable rarely, if ever. Therefore, Commerce could reasonably conclude that Section 1677b(e)(2)(A) provides for use of the actual amounts incurred and realized for profit in connection with the production and sale of a foreign-like product. <u>See id.</u>

antidumping duty proceedings without necessarily generating more accurate results. It would also make the statutorily preferred CV-profit method inapplicable to most cases involving CV.

Final Results, 63 Fed. Reg. at 33,333.

The SAA sets out the two situations in which the preferred CV

profit method would be inapplicable:

[19 U.S.C. § 1677b(e)(2)(B)] establishes alternative methods for calculating amounts for . . . profit in those instances where the method described in section [1677b(e)(2)(A)] cannot be used, either because there are no home market sales of the foreign[-]like product or because all such sales are at below-cost prices.

H.R. Doc. 103-316 at 840, 1994 U.S.C.C.A.N. at 4176.

In the case at bar, because the actual amounts for profit

realized by NSK were available, Commerce applied the preferred

method, as mandated by Section 1677b(e)(2)(A), by aggregating those

profits. The application, however, was justified only with respect

to merchandise that "is complex [and] encompassing numerous

characteristics," accord Def.'s Mem. at 17, that is, merchandise

that has no matching counterpart present in the review at issue.

The arguments by Commerce, however, cannot be warranted with regard

to merchandise that can actually be matched in accordance with the

statutorily provided hierarchy. The sole fact that grouping of

merchandise into numerous categories for the purpose of valuation,

specifically: (1) a category of merchandise that is sufficiently

complex and encompassing numerous characteristics; and (2) one or

more categories of merchandise that could be matched in accordance with the statutorily provided hierarchy, "would add an additional layer of complexity," Final Results, 63 Fed. Reg. at 33,333, cannot justify blatant disregard of a clear statutory requirement. See Timex V.I., Inc., 157 F.3d at 882 (pointing out that "[b]ecause a statute's text is Congress'[] final expression of its intent, if the text answers the question, that is the end of the matter").

NSK asserts that Commerce must calculate CV profit for cylindrical roller bearings on a model or family basis when using the statutory preferred methodology. See NSK's Reply at 2-8. The Court is provided with no sufficient explanation whether cylindrical roller bearings at issue are: (1) complex merchandise that encompasses characteristics so numerous that the process of valuation shall be entrusted to Commerce's discretion; or (2) merchandise that can be matched in accordance with the statutorily provided hierarchy. If this Court is "to play [its] statutorily required role[] in reviewing Commerce's determination[], it is important that [the Court] ha[s] clear guidance from Commerce as to what [are the] actual[]" characteristics of the merchandise at issue. SKF USA Inc. v. United States, 263 F.3d 1369, 1383 (Fed. Cir. 2001).

Therefore, the issue is remanded to Commerce to: (1) determine whether NSK's cylindrical roller bearings at issue are (a) complex

merchandise that encompasses characteristics so numerous that the process of valuation shall be entrusted to Commerce's discretion, or (b) merchandise that can be matched in accordance with the statutorily provided hierarchy; and (2) if Commerce concludes that NSK's cylindrical roller bearings are merchandise that could be matched in accordance with the statutorily provided hierarchy, change Final Results, 63 Fed. Reg. 33,320, accordingly.

## II.  Commerce's Refusal of a Partial Level-of-Trade Adjustment

### A.  BACKGROUND

During the review at issue, Commerce identified two distinct commercial levels of trade ("LOTs") for NSK: (1) original equipment manufacturers ("OEMs") in the home market; and (2) aftermarket ("AM") customers.  See Final Results, 63 Fed. Reg. at 33,330. Commerce further determined that: (1) there was one constructed export price ("CEP") LOT for NSK and two home market LOTs; (2) the CEP LOT was not the same as either one of the two home market LOTs; (3) there was no information on the record that would enable Commerce to quantify the price differences in the home market between the CEP LOT and either one of the two normal value ("NV") LOTs, and make an LOT adjustment.  See id.  Instead, because the home market LOTs were at a more advanced stage of distribution than the CEP LOT, Commerce made a CEP offset for all such sales.  See id.  Therefore, in comparing CEP LOT sales with NSK's home market

LOTs, Commerce applied a CEP offset to NV for all of NSK's CEP transactions. See id. The CEP offset applied by Commerce was the sum of indirect selling expenses incurred on the home market sale up to the amount of indirect selling expenses incurred on the United States sale. See id.

### B.   CONTENTIONS OF THE PARTIES

While not contesting the manner in which Commerce determined the LOT of CEP or NV transactions, and agreeing with: (1) the LOT methodology used for home market OEM sales; and (2) Commerce's conclusion that "there was no record information that would allow Commerce to quantify the downward price adjustment to adjust fully the AM NV [LOT] to the CEP [LOT]," NSK maintains that Commerce erred in "Commerce's conclusion not to calculate a partial LOT adjustment . . . for CEP sales matched to AM NV sales based on the price differences between OEM NV and AM NV sales." Mem. P. & A. Supp. NSK's Mot. J. Agency R. ("NSK's Mem.") at 22 (emphasis omitted). Specifically, NSK claims that the pertinent statute and legislative history require Commerce to make such a partial LOT adjustment. See id. at 22-23. Moreover, examining the language of Koyo Seiko Co. v. United States, 22 CIT 424, 427-28, 8 F. Supp. 2d. 862, 865-66 (1998), NSK asserts that the distinctions between Koyo Seiko Co., 22 CIT at 427-28, 8 F. Supp.2d at 865-66, and the case at bar support NSK's conclusion that a partial LOT adjustment is

warranted in the given circumstances.  See NSK's Mem. at 25.

Commerce maintains that Commerce properly denied NSK a partial LOT adjustment, operating under the mandates of 19 U.S.C. §§ 1677b(a)(7)(A) and 1677b(a)(7)(B) (1994) and in accordance with Commerce's practice.  See Def.'s Mem. at 26-32.  Torrington supports Commerce's position and asserts that Commerce's reading and application of the pertinent statutory provisions was reasonable.  See Torrington's Resp. at 12-16.

### C.  ANALYSIS

The relevant statute provides that LOT shall be calculated in the following manner:

> The price described in [19 U.S.C. § 1677](1)(B) shall . . . be increased or decreased to make due allowance for any difference (or lack thereof) between the export price or constructed export price and the price described in [19 U.S.C. § 1677](1)(B) (other than a difference for which allowance is otherwise made under this section) that is shown to be wholly or partly due to a difference in level of trade between the export price or constructed export price and normal value, if the difference in level of trade[:] (i) involves the performance of different selling activities; and (ii) is demonstrated to affect price comparability, based on a pattern of consistent price differences between sales at different levels of trade in the country in which normal value is determined.
>
> In a case described in the preceding sentence, the amount of the adjustment shall be based on the price differences between the two levels of trade in the country in which normal value is determined.

19 U.S.C. § 1677b(a)(7)(A).

Therefore, an LOT adjustment is to be made to price-based NV only for a difference that is shown to be wholly or partly due to a difference in LOT between the CEP (or export price) and NV. Conversely, the statute provides that

> [w]hen normal value is established at a level of trade which constitutes a more advanced stage of distribution than the level of trade of the constructed export price, but the data available do not provide an appropriate basis to determine under subparagraph . . . (ii) [of 19 U.S.C. § 1677b(a)(7)(A)] a level of trade adjustment, normal value shall be reduced by the amount of indirect selling expenses incurred in the country in which normal value is determined on sales of the foreign[-]like product but not more than the amount of such expenses for which a deduction is made under Section 1677a(d)(1)(D) of this title.

19 U.S.C. § 1677b(a)(7)(B).

In other words, 19 U.S.C. § 1677b(a)(7)(B) provides for a CEP offset. Accordingly, Commerce's practice at the time of the review was to refuse to calculate an LOT adjustment in those cases where the home market data does not demonstrate that a CEP LOT exists with respect to any transactions. Commerce later on reduced this principle to writing, and the pertinent regulation provides that

> [Commerce] will determine that a difference in level of trade has an effect on price comparability <u>only if</u> it is established to the satisfaction of [Commerce] that there is a <u>pattern of consistent price differences</u> between sales in the market in which normal value is determined: (i) [a]t the level of trade of the export price or constructed export price (whichever is appropriate); and (ii) [a]t the level of trade at which normal value is determined.

19 C.F.R. § 351.412(d) (1998) (emphasis supplied).

The Court holds that Commerce's conclusion that 19 U.S.C. § 1677b(a)(7)(A) does not provide for LOT adjustments other than those based upon price differences in the home market between CEP LOT and NV LOT is reasonable. See, e.g., NSK Ltd. v. United States, 25 CIT ___, 170 F. Supp. 2d 1280 (2001); Torrington Co. v. United States, 25 CIT ___, 146 F. Supp. 2d 845 (2001); SNR Roulements v. United States, 24 CIT ___, 118 F. Supp. 2d 1333 (2000); NTN Bearing Corp. of Am. v. United States, 24 CIT ___, 104 F. Supp. 2d 110 (2000); Koyo Seiko Co., 22 CIT 424, 8 F. Supp. 2d 862.

As Commerce correctly observes, the mere fact that the language of Section 1677b(a)(7)(A) of Title 19 employs the term "partly" could be reasonably interpreted as providing that

> where there is a home market pattern of price differences between the level of trade of the CEP and the [LOT] of the NV, Commerce must adjust only for that portion of the price differences which is associated with the difference in [LOT]. However, there is no indication [in the statutory language or in the legislative history of the statute] that the pattern of price differences between two [LOTs] in the home market, absent a CEP [LOT] in the home market, [warrants an LOT] adjustment[, whether it is] "whole" or "partial."

Def.'s Mem. at 30 (emphasis supplied)

Commerce explained that

[Commerce] may make [LOT] adjustments when there is "any

difference . . . between the export price or constructed
export price and the normal value that is shown to be
wholly or partly due to a difference in the level of
trade between the export price or the constructed export
price and normal value." [Commerce, however,] find[s] no
explicit authority to make [an LOT] adjustment between
two home-market [LOTs] where neither level is equivalent
to the level of the [United States] sale.

Final Results, 63 Fed. Reg. at 33,331 (citing 19 U.S.C. §
1677b(a)(7)(A)).

The Court agrees.  Indeed, 19 U.S.C. § 1677b(a)(7)(A) is
particularly deferential to Commerce in circumstances in which
Commerce calculates a CEP offset in lieu of an LOT adjustment.
Section 1677b(a)(7)(A) explicitly provides that the LOT adjustment
need not be made where an "allowance is otherwise made" under the
statute, and this statement encompasses all alternative scenarios
in which such allowance could be made.  Therefore, the Court
disagrees with NSK that Koyo Seiko Co., 22 CIT at 427, 8 F. Supp.
2d at 865, is distinguishable from the case at bar solely upon the
basis that the plaintiff in Koyo Seiko Co., 22 CIT at 427, 8 F.
Supp. 2d at 865, sought a full LOT adjustment based upon a
constructed NV, whereas in the case at bar "actual price-based NVs
exist by which Commerce can calculate a partial LOT adjustment."
NSK's Mem. at 25.  Section 1677b(a)(7)(A) only provides for LOT
adjustments based upon price differences in the home market between
the CEP level of trade and the NV level of trade.  While the Court
appreciates the point advanced by NSK, "Commerce's interpretation

. . . is reasonable, in light of the existence of the CEP offset to cover situations such as those at issue." <u>Koyo Seiko Co.</u>, 22 CIT at 429, 8 F. Supp. 2d at 866.

Based on the foregoing, the Court holds that Commerce reasonably: (1) interpreted 19 U.S.C. § 1677b(a)(7)(A) as a mandate precluding a partial LOT adjustment in those cases where the home market sales are not at the same LOT as the CEP LOT; and (2) denied NSK a partial LOT adjustment.

### III. Commerce's Treatment of United States Repacking Expenses as Direct Selling Expenses

#### A. BACKGROUND

NSK delivered the subject merchandise to unaffiliated customers in the United States from warehouses owned and operated by NSK. <u>See</u> NSK's Mem. at 6. During the process of bringing the merchandise through NSK's warehouses, NSK incurred a number of expenses. <u>See id.</u> at 6-7. Consequently, NSK provided Commerce with a list of those expenses and included, among other items, the expenses incurred during United States repacking of the merchandise. <u>See id.</u> at 7. While reducing the United States price of the merchandise for all other expenses listed by NSK in accordance with 19 U.S.C. §§ 1677a(c)(2)(A) and 1677a(d)(1)-(3) (1994), Commerce denied NSK an allowance for the repacking expenses under 19 U.S.C. § 1677a(c)(2)(A) and, instead, treated NSK's United

States repacking expenses as direct selling expenses pursuant to 19

U.S.C. § 1677a(d)(1)(B). See Preliminary Results, 63 Fed. Reg. at

6515; Final Results, 63 Fed. Reg. at 33,339.


   B.   CONTENTIONS OF THE PARTIES

   NSK asserts that Commerce erred in treating NSK's United

States repacking expenses as direct selling expenses pursuant to 19

U.S.C. § 1677a(d)(1)(B). NSK maintains that United States

repacking expenses: (1) constitute expenses incidental to bringing

the subject merchandise from the original place of shipment in a

foreign country to the place of delivery within the United States;

and (2) differ from direct selling expenses associated with, for

example, credit, guarantees, and warranties, that is, expenses that

are entirely unrelated to the process of bringing the merchandise

from the place of shipment to NSK's unaffiliated customers in the

United States. See NSK's Mem. at 26-29. Therefore, NSK concludes

that its United States repacking expenses should have been deducted

pursuant to 19 U.S.C. § 1677a(c)(2)(A). See id.

   Commerce reads 19 U.S.C. § 1677a(c)(2)(A) as a provision that

applies to "transportation and other expenses, including

warehousing expenses, incurred in bringing the subject merchandise

from the original place of shipment in the exporting country to the

place of delivery in the United States," SAA, H.R. DOC. 103-316,

at 823, <u>reprinted in</u> 1994 U.S.C.C.A.N. at 4163, and thus, allows

Commerce's treatment of NSK's repacking expenses as direct selling

expenses.  <u>See</u> Def.'s Mem. at 33-34.  Commerce further explains

that Commerce does not

> disagree with NSK['s] . . . charaterization [sic.] of
> repacking expense as a warehousing expense.  [Rather,
> Commerce] regard[s] repacking expense as a direct selling
> expense because it was performed on individual products
> in order to sell the merchandise to the unaffiliated
> customer in the United States.  Warehousing expense, on
> the other hand, is merely an expense associated with
> storing the merchandise in a location before or during
> the movement process. . . . [R]epacking does not have to
> be performed in order for merchandise to be moved while
> warehousing may be required in the movement process.
> Thus, [Commerce] conclude[s] that [the United States]
> repacking expense is an expense associated with selling
> the merchandise.

<u>Id.</u> at 33 (quoting <u>Final Results</u>, 63 Fed. Reg. at 33,339, emphasis

omitted).

Torrington generally agrees with Commerce's arguments.  <u>See</u>

Torrington's Resp. at 16-19.  Torrington notes that Commerce's

treatment of NSK's repacking expenses as selling rather than

movement expenses is consistent with the statutory mandates of 19

U.S.C. §§ 1677a(c)(2)(A) and 1677a(d)(1)(B).  <u>See id.</u> at 17-19.

###   C.   ANALYSIS

The Court is not convinced by NSK's argument.  First, Section

1677(d)(1)(B) of Title 19 does not provide an exhaustive list of

direct selling expenses and, thus, its application cannot be

limited only to the expenses associated with, for example, guarantees or warranties. See 19 U.S.C. § 1677a(d)(1)(B); accord SAA, H.R. Doc. 103-316 at 823, reprinted in 1994 U.S.C.C.A.N. at 4163 (stating that direct selling expenses under § 1677a(d)(1)(B) are not limited to credit expenses, guarantees and warranties, but include "expenses which result from and bear a direct relationship to the particular sale in question"). Therefore, it was reasonable for Commerce to treat repacking expenses as direct selling expenses deductible pursuant to Section 1677(d)(1)(B) because the repacking "was performed on individual products in order to sell the merchandise to the unaffiliated customer in the United States." Def.'s Mem. at 34 (quoting Final Results, 63 Fed. Reg. at 33,339).

Second, the Court finds that NSK's United States repacking expenses were not incidental to bringing the subject merchandise from the original place of shipment to the place of delivery in the United States. Conversely, the Court holds that Commerce acted reasonably in its refusal to

> view repacking expenses as movement expenses. The repacking of subject merchandise in the United States bears no relationship to moving the merchandise from one point to another. The fact that repacking is not necessary to move merchandise is borne out by the fact that the merchandise was moved from the exporting country to the United States prior to repacking. Rather, [Commerce] view[s] repacking expenses as direct selling expenses respondents incur on behalf of certain sales which [Commerce] deduct[s] pursuant to . . . [Section 1677a(d)(1)(B)] . . . , which directs [that CEP shall be reduced] by "expenses that result from, and bear a direct

relationship to, the sale, such as credit expenses, guarantees, and warranties."

Final Results, 63 Fed. Reg. at 33,339; accord RHP Bearings, Ltd. v. United States, 24 CIT ___, 120 F. Supp. 2d 1116 (2000).

Therefore, the Court affirms Commerce's decision to treat NSK's repacking expenses as direct selling expenses. See RHP Bearings, Ltd. v. United States, 24 CIT ___, 110 F. Supp. 2d 1043 (2000), vacated on other grounds, RHP Bearings, Ltd. v. United States, 288 F.3d 1334 (Fed. Cir. 2002); NTN Bearing Corp. of Am. v. United States, 24 CIT ___, 104 F. Supp. 2d 110 (2000).

## IV. Denial of an Adjustment to United States Indirect Selling Expenses for Interest Allegedly Incurred in Financing Cash Deposits for Antidumping Duties

### A. BACKGROUND

During the review at issue, NTN requested Commerce to make an adjustment to NTN's United States indirect selling expenses for interest allegedly incurred by NTN in financing cash deposits for antidumping duties. See Final Results, 63 Fed. Reg. at 33,347-48. Commerce denied the adjustment and deducted the entire amount of indirect selling expenses, including all interest, from NTN's CEP. See id. at 33,348. Commerce explained that

> [Commerce] should not remove such financial expenses from reported indirect selling expenses under any circumstances because they do not bear directly on an expense that parties incur solely as a result of the antidumping duty order; this holds regardless of whether

the party claims any link to antidumping duty deposits or other expenses, such as legal fees. As [Commerce] ha[s] stated previously: money is fungible. If an importer acquires a loan to cover one operating cost, that may simply mean that it will not be necessary to borrow money to cover a different operating cost.

Even if [NTN] has a loan amount that equals its cash deposits or can demonstrate a "paper trail" connecting the loan amount to cash deposits, [Commerce] do[es] not consider the loan amount to be related to the cash deposits and will not remove it from the indirect selling expenses. Moreover, the result should not be different where an actual expense can not be associated in any way with the cash deposits. [Commerce] reject[s] imputation of an adjustment both for this reason [as well as another reason]: there is no real opportunity cost associated with cash deposits when the paying of such deposits is a precondition for doing business in the United States. As a result, [Commerce] ha[s] not accepted NTN's reduction in indirect selling expenses based on actual borrowings to finance cash deposits nor will [Commerce] accept such a reduction based on imputed borrowings. [Commerce] consider[s] all financial expenses the affiliated importer incurred with respect to sales of subject merchandise in the United States to be indirect selling expenses . . . .

Although [Commerce] ha[s] allowed removal of expenses for financing cash deposits in [one previous case, Commerce] reexamined this issue . . . and concluded that the new policy best reflects commercial reality with respect to affiliated importer situations.

Id. (internal quotation and citations omitted).

### B.  CONTENTIONS OF THE PARTIES

NTN asserts that Commerce wrongly denied an adjustment to NTN's United States indirect selling expenses for interest that NTN allegedly incurred in financing cash deposits for antidumping duties. See Rule 56.2 Mot. and Mem. J. Agency R. Submitted Behalf

Pls. and Def.-Intervenors, NTN ("NTN's Mem.") at 7, 11-13. NTN contends that the denial is inconsistent with Commerce's previous position that the costs incurred solely in financing antidumping duty cash deposits cannot be categorized as selling expenses. See id. at 11 (citing Federal-Mogul Corp. v. United States, 20 CIT 1438, 1440-41, 950 F. Supp. 1179, 1182-83 (1996), and Final Results of Antidumping Duty Administrative Reviews of Antifriction Bearings (Other than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Singapore, and the United Kingdom ("Previous Ruling"), 62 Fed. Reg. 2087,[3] 2104 (Jan. 15, 1997)).

Commerce maintains that Commerce's denial of an adjustment to NTN's United States indirect selling expenses for the expenses related to the financing of antidumping duty cash deposits reflected Commerce's reasonable reading and application of the statutory mandate. See Def.'s Mem. at 34-39. Torrington supports Commerce's contention and points out that: (1) "allowing [United States] selling expenses to be reduced in the manner claimed by NTN runs counter to the purpose of the antidumping law, which is to discourage the unfair practice of dumping," Torrington's Resp. at 20; and (2) NTN failed to demonstrate that it actually incurred interest expenses attributable to financing payment of antidumping

---

[3] The Court presumes that NTN, while citing to 62 Fed. Reg. 2087, intended to cite to 62 Fed. Reg. 2081.

duty cash deposits.  <u>See id.</u> at 21.


   **C.   ANALYSIS**

      **1.   COMMERCE'S CHANGES OF POLICY**

Agency statements provide guidance to regulated industries. While "'an agency does not act rationally when it chooses and implements one policy and decides to consider the merits of a potentially inconsistent policy in the very near future,'" <u>Transcom, Inc. v. United States</u>, 24 CIT ___, ___, 123 F. Supp. 2d 1372, 1381 (2000) (quoting <u>ITT World Communications, Inc. v. FCC</u>, 725 F.2d 732, 754 (D.C. Cir. 1984)), Commerce, in view of the rapidly-changing world of global trade and Commerce's limited resources, should be able to rely on its "unique expertise and policy-making prerogatives." <u>Southern Cal. Edison Co. v. United States</u>, 226 F.3d 1349, 1357 (Fed. Cir. 2000).  "'The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy . . . .'" <u>Chevron</u> 467 U.S. at 843 (quoting <u>Morton v. Ruiz</u>, 415 U.S. 199, 231 (1974)).

An agency decision involving the meaning or reach of a statute that reconciles conflicting policies "'represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, [and a reviewing court] should not

disturb [an agency's decision] unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.'" Id. at 845 (quoting United States v. Shimer, 367 U.S. 374, 382-83 (1961)). Furthermore, an agency must be allowed to assess the wisdom of its policy on a continuing basis. Under the Chevron regime, agency discretion to reconsider policies is inalienable. See id. at 843. Any assumption that Congress intended to freeze an administrative interpretation of a statute would be entirely contrary to the concept of Chevron which assumes and approves of an administrative agency's ability to change their interpretations. See, e.g., Maier, P.E. v. United States EPA, 114 F.3d 1032, 1043 (10th Cir. 1997), J.L. v. Social Sec. Admin., 971 F.2d 260, 265 (9th Cir. 1992), Saco Defense Sys. Div., Maremont Corp. v. Weinberger, 606 F. Supp. 446, 450-51 (D. Me. 1985). In sum, underlying agency interpretative policies "are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." Chevron 467 U.S. at 844.

### 2. COMMERCE'S DETERMINATION AT BAR

Certain expenses incurred by the affiliated seller during the process of selling the subject merchandise in the United States are subject to deduction from the CEP of the seller. See 19 U.S.C. § 1677a(d)(1). However, Section 1677a(d)(1) of Title 19 does not

provide a closed and exhaustive list of such expenses.  See id.
Consequently, Commerce considers certain ancillary expenses as part
of the incurred indirect expenses subject to deduction under
Section 1677a(d)(1).  For example, while antidumping duties and
cash deposits have never been considered by Commerce as expenses
deductible from United States price, see Final Results of
Antidumping Duty Administrative Reviews of Antifriction Bearings
(Other Than Tapered Roller Bearings) and Parts Thereof From France,
Germany, Italy, Japan, Romania, Singapore, Sweden and the United
Kingdom ("Later Ruling"), 62 Fed. Reg. 54,043, 54,079 (Oct. 17,
1997), interest expenses incurred in connection with selling
activities in the United States were deemed deductible from United
States price.  See Final Results, 63 Fed. Reg. at 33,348.
Therefore, for those expenses that Commerce deemed to be non-
selling expenses, Commerce allowed an adjustment to indirect
selling expenses.  See id.

For some period of time, Commerce's practice was to deem
financing interest of cash deposits as not a selling expense and,
therefore, Commerce did allow respondents that incurred financing
interest of cash deposits to deduct such interest from indirect
selling expenses prior to the deduction of such indirect selling
expenses from the CEP.  See Previous Ruling, 62 Fed. Reg. at 2104.
However, at a later point, Commerce reexamined this practice and

the policies underlying it.  Specifically, Commerce observed that

> [t]he statute does not contain a precise definition of
> what constitutes a selling expense.  Instead, Congress
> gave [Commerce] discretion in this area. It is a matter
> of policy whether [Commerce] consider[s] there to be any
> financing expenses associated with cash deposits.
> [Commerce] recognize[s] that [Commerce] ha[s], to a
> limited extent, removed such expenses from indirect
> selling expenses for such financing expenses in past
> reviews . . . .  However, [Commerce] ha[s] reconsidered
> [Commerce's] position on this matter and ha[s] now
> concluded that this practice is inappropriate.

Later Ruling, 62 Fed. Reg. at 54,079.


Commerce has the discretion to alter its policy, so long as

Commerce presents a reasonable rationale for its departure from the

previous practice.   See Chevron, 467 U.S. at 843, Timken Co. v.

United States, 22 CIT 621, 628, 16 F. Supp. 2d 1102, 1106 (1998).

Commerce explained its rationale for the reconsideration as

follows:

> Underlying [Commerce's] logic . . . is an attempt to
> distinguish between business expenses that arise from
> economic activities in the United States and business
> expenses that are direct, inevitable consequences of the
> dumping order.
>
> Financial expenses allegedly associated with cash
> deposits are not a direct, inevitable consequence of an
> antidumping order. . . . Companies  may choose to meet
> obligations for cash deposits in a variety of ways that
> rely on existing capital resources  or that require
> raising new resources through debt or equity. . . . In
> fact, companies face these choices every day regarding
> all their expenses and financial obligations. There is
> nothing inevitable about a company having to finance cash
> deposits and there is no way for [Commerce] to trace the
> motivation or use of such funds even if it were.

. . . .

        So, while under the statute [Commerce] may allow a
limited exemption from deductions from [United States]
price for cash deposits themselves and legal fees
associated with participation in dumping cases,
[Commerce] do[es] not see a sound basis for extending
this exemption to financing expenses allegedly associated
with financing cash deposits.  . . .

        [Commerce] see[s] no merit to the argument that,
since [Commerce] do[es] not deduct cash deposits from
[United States] price, [Commerce] should also not deduct
financing expenses that are arbitrarily associated with
cash deposits. To draw an analogy as to why this logic is
flawed, [Commerce] also do[es] not deduct corporate taxes
from [United States] price; however, [Commerce] would not
consider a reduction in selling expenses to reflect
financing alleged to be associated with payment of such
taxes.

Later Ruling, 62 Fed. Reg. at 54,079.


The Court finds Commerce's rationale for reconsideration

convincing.  Cf. Timken Co., 22 CIT at 628, 16 F. Supp. 2d at 1106

(upholding Commerce's reconsideration and noting that, while the

Court could be concerned with Commerce's sudden change in practice,

Commerce is afforded significant deference in its statutory

interpretation).  Moreover, the Court holds that Commerce's current

interpretation of Section 1677a(d)(1) is reasonable.  Accord

Chevron, 467 U.S. at 845; Koyo Seiko Co. v. United States, 26 CIT

___, ___, 186 F. Supp. 2d 1332, 1337 (2002); NTN Bearing Corp. of

Am. v. United States, ___ CIT ___, ___, 186 F. Supp. 2d 1257, 1322

(2002).  Therefore, the Court affirms Commerce's decision to deny

an adjustment to NTN's United States indirect selling expenses for

interest allegedly incurred by NTN in financing NTN's cash deposits for antidumping duties.

## V. Commerce's Decision to Include in United States Sales Database Sample Transactions that Were Allegedly Made for No Consideration

### A. BACKGROUND

In order to calculate a respondent's margin of dumping, Commerce compares NV with export price ("EP") or CEP. EP and CEP are defined in 19 U.S.C. § 1677a(a) and (b) (1994), respectively. Each definition refers to the price at which the subject merchandise "is first sold . . . ." 19 U.S.C. § 1677a(a) and (b) (emphasis supplied). In NSK Ltd. v. United States, 115 F.3d 965 (Fed. Cir. 1997), the Court of Appeals for the Federal Circuit ("CAFC") held that the usage of the term "sale" in 19 U.S.C. § 1677a(a) and (b) indicates a reference to a transaction involving a material consideration. Specifically, the CAFC clarified that, in order to be considered a sale within the meaning of the antidumping law, a transaction must involve "both a transfer of ownership to an unrelated party and consideration." NSK, 115 F.3d at 975; accord SKF USA Inc. v. United States, 23 CIT 299; 53 F. Supp. 2d 1330 (1999).

In accordance with NSK, 115 F.3d at 975, Commerce revised its policy with respect to sales of sample products. As a result of

its revised policy, Commerce excludes from the margin calculation sample transactions for which a respondent has established that there is either no transfer of ownership or no receipts of a consideration. See, e.g., Later Ruling, 62 Fed. Reg. at 54,070; Final Results, 63 Fed. Reg. at 33,342. Commerce, however, noticed that Commerce would not automatically exclude from its dumping analysis any transaction merely because the transaction is labeled by a respondent as a "sample sale." Commerce explained that

> [i]n light of the CAFC's opinion, [Commerce] ha[s] re-evaluated and revised [its] policy with respect to sales of sample products. Therefore, pursuant to the CAFC's opinion, [Commerce] now excludes from the margin calculation sample transactions for which a respondent has established that there is [either] no transfer of ownership [or] no consideration.
>
> This new policy does not mean that [Commerce] automatically excludes from analysis any transaction to which a respondent applies the label "sample." In fact, in these reviews, [Commerce] determined that there were instances where [Commerce] should not exclude such alleged samples from [Commerce's] dumping analysis. It is well-established that the burden of proof rests with the party in possession of the needed information. . . . In several cases . . . respondents failed to demonstrate or to submit documentation to show that their claimed sample sales lacked consideration. When respondents failed to support their sample claim, [Commerce] did not exclude the alleged samples from [Commerce's] margin analysis. Because the inclusion of zero-priced transactions in the home-market database would benefit respondents by lowering average normal value, however, [Commerce] excluded zero-priced items from the home-market database when such unsupported transactions occurred in the home market.

Final Results, 63 Fed. Reg. at 33,342.

**B.    Contentions of the Parties**

NTN contends that Commerce acted contrary to NSK, 115 F.3d 965, and SKF, 23 CIT 299, 53 F. Supp. 2d 1330, when it included NTN's sample sales in NTN's United States sales database. See NTN's Mem. at 13.

Commerce maintains that Commerce properly included NTN's zero-priced United States sales in NTN's United States sales database and NTN's dumping margin calculation as "facts available." See Def.'s Mem. at 40-45. Specifically, Commerce maintains that this action was warranted since "NTN withheld information requested by Commerce which would have permitted Commerce to evaluate whether NTN received consideration for these transactions." Id. at 39-40. Torrington supports Commerce's position and asserts that NTN's zero-price transactions could be not free of broader forms of consideration as a part of some broad contractual agreement. See Torrington's Resp. at 22-24. In addition, Torrington suggests that NTN could have been offering free samples to its clients as a part of a paid-for package, for example "ten [paid-for] units plus a [free] sample."[4]  See id. at 23 (internal quotation omitted).

---

[4] The Court will not entertain Torrington's arguments since they are based on speculations rather than facts. As NTN correctly points out, "Torrington's argument amounts to nothing more than conjecture [without] support from the factual evidence on the record." Reply Pls. NTN Gov't's and Torrington's Aug. 6, 1999, Opp'n Mem. and Resp. Br. (NTN's Reply) at 5.

C. ANALYSIS

Commerce is correct in its reading of the language of NSK, 115 F.3d at 975, as stating that Commerce is not obligated to exclude any transaction from the United States sales database merely because such transaction is labeled as a sample sale. Cf. Def.'s Mem. at 41. Similarly, Commerce is correct in its conclusion that nothing in the statutory mandate or in the holding of NSK, 115 F.3d at 975, precludes Commerce from requiring a party to demonstrate that it received no consideration in return for the samples. See id.

During the review at issue, Commerce distributed its questionnaire that requested respondents to identify reported sample transactions by a pertinent code and, in addition: (1) define transactions placed in a sample sale category; (2) describe how the orders for these sales were communicated; (3) list documents available to demonstrate that these sales were samples; and (4) state whether the customer in question purchased these particular items before the date of the claimed sample sale and, if so, the amount of items previously purchased. See NTN's Mem. Ex. 2. In response, NTN stated that the samples were provided to customers for the purpose of allowing the customer to determine whether a particular product is suited to the customer's needs and described NTN's process of furnishing samples as follows: (1) a

customer requests a sample; (2) the sample is being coded and the order number is recorded; and (3) there are no references made to the issue of whether the customer may have purchased the particular items previously. See id. NTN also clarified that a sample could be requested for any new application, regardless of previous furnishments of the same sample or purchases of the product identical to the sample. See id. Examining these responses, Commerce concluded that NTN failed to respond adequately to Commerce's questions. See Def.'s Mem. at 43. Therefore, Commerce determined that it was appropriate to resort to facts available and to draw an adverse inference. See id. Commerce concluded that the information provided by NTN left Commerce in the dark on the issue of whether the items were provided as samples or as a discount in conjunction with other sales. See id. at 43-44. Consequently, Commerce included NTN's claimed sample sales in NTN's United States sales database because Commerce expected NTN, the party in possession of the pertinent information, to carry the burden of producing that information, particularly when NTN was seeking a favorable adjustment or exclusion. See id., see also Final Results, 63 Fed. Reg. at 33,343. Specifically, Commerce concluded that it was reasonable for Commerce to resort to "facts available" under 19 U.S.C. § 1677e(a)(2)(A) (1994) since Commerce's determination was handicapped by NTN's failure to clarify the history of parties receiving samples. See Def.'s Mem. at 43-44.

While the Court disagrees with Commerce on the applicability of 19 U.S.C. § 1677e(a)(2)(A) and the reference to the usage of "facts available,"[5] the Court holds that Commerce's decision to include the sales designated by NTN as sample ones in NTN's United States sales is reasonable. Indeed, the Court sees little reason in supplying and re-supplying and yet re-supplying the very same sample to the very same customer in order to persuade the customer to purchase the item, if such supplies are made within reasonably short periods of time. It would be even less logical to supply a sample to a client that has made a recent bulk purchase of the very item being sampled to the client. Therefore, Commerce's interest in the history of the samples furnished to particular clients was entirely legitimate.

Commerce is correct in its observation that "[i]t is well settled that the party in possession of information has the burden of producing that information in order to obtain a favorable adjustment or exclusion." Def.'s Mem. at 44 (relying on Zenith Elecs. Corp. v. United States, 988 F.2d 1573, 1583 (Fed. Cir. 1993); Timken Co. v. United States, 11 CIT 786, 804, 673 F. Supp.

---

[5] The statute provides that "[i]f . . . an interested party . . . withholds information that has been requested by [Commerce] . . . , [Commerce] shall . . . use the facts otherwise available in reaching the applicable determination . . . ." 19 U.S.C. § 1677e(a)(2)(A) (emphasis supplied). Indeed, the process of including sample sales cannot be qualified as usage of facts otherwise available.

495, 513 (1987)).

In the case at bar, NTN was the party either in possession of the information regarding the purchase history of its alleged samples, including the price and quantity for any prior or subsequent purchases of these products by the same or other customers, or the party obligated to create and preserve such information in order to obtain a more favorable margin. NTN's failure to either trace or supply such information to Commerce does not impose an obligation on Commerce to interpret the gaps of information in NTN's favor. Indeed, the statutory mandate and the language of NSK, 115 F.3d at 975, applies only to those situations when a respondent can show that the transaction at issue was a sample sale for no consideration. Neither the statute nor NSK, 115 F.3d at 975, encompass the infinite variety of situations where Commerce could hypothesize that the transactions under review could have been sample sales for no consideration. As Commerce correctly observes, "NTN cannot be excused from responding to Commerce's questions because, in [NTN's] view, the history of prior purchases of samples 'does not affect the status of subsequent sales.'" Def.'s Mem. at 44 (quoting NTN's Mem. Ex. 2). Indeed, it is for Commerce and not for the respondents to determine the relevancy of Commerce's questions.

Therefore, since the record does not contain necessary information, Commerce could reasonably conclude that the information missing would indicate that the transactions at issue were not sample sales for no consideration within the meaning of 19 U.S.C. § 1677a(a) and (b) and NSK, 115 F.3d 965. For these reason, the Court affirms Commerce's decision to include NTN's alleged samples in Commerce's final dumping margin calculation.

**VI. Commerce's Decision to Exclude from the Margin Calculation the Home Market Sales with High Profits and Home Market Sample Sales**

### A. BACKGROUND

According to a pertinent provision, NV shall be based upon "the price at which the foreign[-]like product is first sold . . . in the ordinary course of trade . . . ." 19 U.S.C. § 1677b(a)(1)(B)(i). The term "ordinary course of trade" is defined as

> conditions and practices which, for a reasonable time prior to the exportation of the subject merchandise, have been normal in the trade under consideration with respect to merchandise of the same class or kind. [Commerce] shall consider the following sales and transactions, among others, to be outside the ordinary course of trade: (A) [s]ales disregarded under[19 U.S.C §] 1677b(b)(1) [(1994);] (B) [t]ransactions disregarded under [19 U.S.C §] 1677b(f)(2).

19 U.S.C. § 1677(15).

Section 1677b(b)(1), in turn, addresses the issue of below-

cost sales.  Section 1677b(f)(2), respectively, deals with the
issue of transactions between affiliated parties.  While both
issues are irrelevant to the part of the determination being
reviewed since neither below-cost sales nor transactions between
affiliated parties were involved, there is a question as to what
other transactions Commerce could consider to fall outside the
"ordinary course of trade."  Examining the statutory language,
Commerce concluded that the term "among others" indicated that
sales or transactions other than those involving below-cost sales
or transactions between affiliated parties could be considered
outside the "ordinary course of trade."  See Def.'s Mem. at 46-49.

Moreover, Commerce concluded that the usage of the term "among
others" without particular definition of such "other" transactions
indicated that Congress intended to grant Commerce broad discretion
on the issue and enabled Commerce to devise an appropriate
methodology for determining when sales are to be considered as
outside the ordinary course of trade.  See id.  Commerce's
interpretation of the statutory mandate relied on an explanation
contained in the SAA which provides that

> Commerce may consider other types of sales or
> transactions to be outside the ordinary course of trade
> when such sales or transactions have characteristics that
> are not ordinary as compared to sales or transactions
> generally made in the same market. Examples of such sales
> or transactions include merchandise produced according to
> unusual product specifications[] [or] merchandise sold at
> aberrational prices.

. . . .

[Section 1677(15)] does not establish an exhaustive list, but [the statutory scheme] intends that Commerce will interpret [19 U.S.C. § 1677(15)] in a manner which will avoid basing normal value on sales which are extraordinary for the market in question, particularly when the use of such sales would lead to irrational or unrepresentative results.

H.R. Doc. 103-316 at 834, reprinted in 1994 U.S.C.C.A.N. at 4171.

Therefore, in the case at bar, Commerce exercised its discretion and determined that NTN's highly profitable sales and sample sales for which NTN received consideration were not demonstrated to be outside the ordinary course of trade.

### B. Contentions of the Parties

NTN contends that Commerce erred in not excluding NTN's home market sales with unusually high profit levels and home market sample sales from the margin calculation because they were outside the ordinary course of trade. See NTN's Mem at 3-4, 7, 14-17.

Commerce asserts that Commerce's determination was a reasonable application of the statutory mandate and supported by substantial evidence. See Def.'s Mem. at 46-49. Torrington supports Commerce's position and states that Commerce correctly included NTN's sales alleged to be made outside the ordinary course of business in the NV calculation. See Torrington's Resp. at 24.

C.   ANALYSIS

"Commerce has the discretion to decide under what circumstances highly profitable sales would be considered to be outside of the ordinary course of trade." Koenig & Bauer-Albert AG v. United States, 22 CIT 574, 589, 15 F. Supp. 2d 834, 850 (1998), vacated on other grounds, Koenig & Bauer-Albert AG v. United States, 259 F.3d 1341 (Fed. Cir. 2001); Mitsubishi Heavy Indus. v. United States, 22 CIT 541, 568, 15 F. Supp. 2d 807, 830 (1998); Notice of Final Determination of Sales at Less Than Fair Value: Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, From Germany, 61 Fed. Reg. 38,166, 38,178 (July 23, 1996); Notice of Final Determination of Sales at Less Than Fair Value: Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, From Japan, 61 Fed. Reg. 38139 (July 23, 1996).

Commerce explains that it refuses to exclude certain highly profitable sales from its calculation of profit for CV: (1) solely on the basis of a mere fact of certain sales having profits higher than those of numerous other sales; (2) because Commerce needs a showing of certain unique or unusual characteristics related to the sales in question in order to consider the transactions outside the ordinary course of trade; and (3) in those situations where the respondent fails to provide credible information other than the

numerical profit amounts to support the respondent's contention that certain home market sales (a) have abnormally high profits, and (b) are outside ordinary course of trade, and such transactions may be considered by Commerce as made in ordinary course of trade. See Def.'s Mem. at 49 (relying on Zenith Elecs., 988 F.2d at 1583; Koenig & Bauer-Albert, 22 CIT 574, 15 F. Supp. 2d 834; Mitsubishi Heavy Indus., 22 CIT 541, 568, 15 F. Supp. 2d 807, 830). Consequently, Commerce's determination whether the profits earned by a respondent in specific sales are abnormal rests upon a number of factors. See Final Rule on Antidumping Duties; Countervailing Duties ("Final Rule"), 62 Fed. Reg. 27,296, 27,299 ( May 19, 1997).

During the review at issue, Commerce rejected NTN's argument that Commerce should exclude home market sample sales and sales with abnormally high profits as outside the ordinary course of trade and stated that,

> [w]ith regard to home-market "sample" sales . . . claimed [to be] outside the ordinary course of trade, [Commerce's] practice is to exclude home-market sales transactions from the margin calculation as outside the ordinary course of trade based on all the circumstances particular to the sales in question. See Murata Mfg. Co. v. United States, [17 CIT 259, 264,] 820 F. Supp. 603, 607 (. . . 1993). With regard to NTN's abnormally high-profit sales, the presence of profits higher than those of numerous other sales does not necessarily place the sales outside the ordinary course of trade. In order to determine that a sale is outside the ordinary course of trade due to abnormally high profits, there must be unique and unusual characteristics related to the sale in question which make it unrepresentative of the home market. See CEMEX, S.A. v. United States, 133 F.3d

[897,] 900 ([1998]).  However, [NTN] has provided no information other than the numerical profit amounts to support its contention that these home-market sales had abnormally high profits.  The simple fact of high profits, standing alone, is not sufficient to find sales to be outside the ordinary course of trade. Accordingly, [Commerce] ha[s] not excluded NTN's "sample" sales with allegedly high profits in calculating normal value.

Final Results, 63 Fed. Reg. at 33,344 (emphasis omitted).

During the review, NTN, in support of its claim that samples and sales "with abnormally high profit levels" were not in the ordinary course of trade, asserted that: (1) any sale with a profit level greater than a certain percentage would be automatically deemed being outside the ordinary course of trade because that percentage was the greatest profit level in the range of profits at which most of the quantity of subject merchandise was sold; or (2) all sales with a profit level exceeding a certain percentage be treated as sales not in the ordinary course of trade because the majority of pieces sold above cost did not exceed this profit level.  See NTN's Mem. Ex. 2.  However, the presence of profits higher than those of numerous other sales does not necessarily place the sales outside the ordinary course of trade. Accord Final Results, 63 Fed. Reg. at 33,344.  Lack of showing that the transactions at issue possessed some unique and unusual characteristics that made them unrepresentative of the home market made it reasonable for Commerce to include these transactions in

NTN's home market database.[6]   Cf. <u>NTN Bearing Corp. of Am. v.</u>
<u>United States</u>, 19 CIT 1221, 1229, 905 F. Supp. 1083, 1091 (1995)
(stating that "[w]ithout a complete explanation of the facts which
establish the extraordinary circumstances rendering particular
sales outside the ordinary course of trade, Commerce cannot exclude
those sales from [NV]").   Therefore, the Court upholds Commerce's
decision to include NTN's sample sales and sales with high profit
in the margin calculation of NTN's home market sales.


**VII.     Commerce's Decision to Disregard Sales to Affiliated
           Customers in the Calculation of Normal Value**

           **A.    BACKGROUND**

     Under the relevant statute, Commerce may base NV on the price
paid by a related party. See 19 U.S.C. § 1677b(a)(3) (1994).
Commerce, however, may exclude related party sales in certain
situations.  Specifically, Commerce's regulation provides that,

> [i]f a producer or reseller sold such or similar
> merchandise to a person related as described [19 U.S.C.
> § 1677(13)), [Commerce] ordinarily will calculate [NV]
> based on that sale only if satisfied that the price is
> comparable to the price at which the producer or reseller
> sold such or similar merchandise to a person not related

---

[6] NTN's alternative argument, namely, that the sample sales
fall outside the ordinary course of trade because they are provided
to customers for the sole purpose of allowing the customers to
determine whether a particular product is suited for their needs,
<u>see</u> NTN's Mem. at 16, is equally unpersuasive for the same reason.
See <u>NTN Bearing Corp. of Am. v. United States</u>, 25 CIT ___, 155 F.
Supp. 2d 715 (2001); <u>NSK Ltd.</u>, 25 CIT ___, 170 F. Supp. 2d 1280;
<u>Torrington Co.</u>, 25 CIT ___, 146 F. Supp. 2d 845.

to the seller.

19 C.F.R. § 353.45(a) (1996).

Pursuant to the regulation, Commerce does not utilize the home market affiliated party sale unless the producer or reseller is able to demonstrate that the transaction was made at arm's length. See NEC Home Elecs., Ltd. v. United States, 54 F.3d 736, 739 (Fed. Cir. 1995) (citing Mitsubishi Heavy Indus. v. United States, 17 CIT 1024, 1028-29, 833 F. Supp. 919, 923 (1993)). To make the requisite showing, the respondent has to present evidence establishing to Commerce's satisfaction that the prices charged to a related party were comparable to those charged to an unrelated party. See 19 C.F.R. § 353.45(a). Commerce also established a practice to determine comparability by examining whether, on average, related party prices were equal to or greater than unrelated party prices. See, e.g., Final Results of Antidumping Duty Administrative Review of Gray Portland Cement and Clinker From Japan, 58 Fed. Reg. 48,826, 48,829 (Sept. 20, 1993); Final Determination of Sales at Less Than Fair Value, Gray Portland Cement and Clinker From Mexico, 55 Fed. Reg. 29,244, 29,250 (July 18, 1990).

### B.    CONTENTIONS OF THE PARTIES

NTN asserts that, in refusing to use affiliated party sales in its calculation of NV, Commerce: (1) erroneously applied its arm's-length test; and (2) relied upon a methodology that was unlawful and not supported by substantial evidence. See NTN Mem. at 8, 17-19; NTN's Reply at 13-14. Specifically, NTN maintains that, since price is only one factor that affects comparability, Commerce, in its process of determining whether prices are comparable, should have examined other factors than price. See id. In addition, NTN points out that it is "inconsistent for [Commerce] to consider [other] factors [than price] in [Commerce's] ordinary course of trade determination, while ignoring [other factors] when conducting [Commerce's] arm's[-]length test."[7] NTN's Reply at 13.

Commerce argues that the issue should not be entertained by the Court since Commerce believes that NTN failed to exhausts NTN's administrative remedies with regard to this issue. See Def.'s Mem. at 53-59. Alternatively, Commerce maintains that Commerce's

---

[7] The Court is not convinced by the analogy drawn by NTN. There is a distinction between "ordinary course of trade" per se and "ordinary course of trade" among affiliated parties. While the former stands for a party's average practice of dealing with the world at large, the latter means a combination of actual and implied agreements between affiliates. Indeed, it is not hard to fancy a situation where a party that trades widgets to the world on a set of conditions and at the price of a dollar per widget, sells the same merchandise to the party's affiliates on the very same conditions but at a penny a widget.

methodology is reasonable and in accordance with the broader mandate of 19 U.S.C. § 1677b(a)(3). See id. at 55-57. Torrington supports Commerce's assertion and points out that, in any event, NTN failed to propose "how these other factors should have affected Commerce's determination." Torrington's Resp. at 26.

### C.  ANALYSIS

#### 1.  EXHAUSTION OF ADMINISTRATIVE REMEDIES

As a preliminary matter, Commerce asserts that the issue of whether Commerce erred in its decision to disregard NTN's sales to affiliated customers in Commerce's calculation of NV should not be entertained by this Court since, according to Commerce, NTN failed to exhaust NTN's administrative remedies.

The exhaustion doctrine requires a party to present its claims to the relevant administrative agency for the agency's consideration before raising these claims to the Court. See Unemployment Compensation Comm'n of Alaska v. Aragon, 329 U.S. 143, 155 (1946) ("A reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented and deprives the [agency] of an opportunity to consider the matter, make its ruling, and state the reasons for its action"). There is, however, no absolute requirement of exhaustion in the Court of International Trade in

non-classification cases. See <u>Alhambra Foundry Co. v. United States</u>, 12 CIT 343, 346-47, 685 F. Supp. 1252, 1255-56 (1988). Section 2637(d) of Title 28 directs that "the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies." By its use of the phrase "where appropriate," Congress vested discretion in the Court to determine the circumstances under which it shall require the exhaustion of administrative remedies. See <u>Cemex, S.A.</u>, 133 F.3d at 905. Therefore, because of "judicial discretion in not requiring litigants to exhaust administrative remedies," the Court is authorized to determine proper exceptions to the doctrine of exhaustion. <u>Alhambra Foundry</u>, 12 CIT at 347, 685 F. Supp. at 1256 (citing <u>Timken Co. v. United States</u>, 10 CIT 86, 93, 630 F. Supp. 1327, 1334 (1986), <u>rev'd in part on other grounds</u>, <u>Koyo Seiko Co. v. United States</u>, 20 F.3d 1156 (Fed. Cir. 1994)).

The Court exercises its discretion to obviate exhaustion where: (1) requiring it would be futile, <u>see Rhone Poulenc, S.A. v. United States</u>, 7 CIT 133, 135, 583 F. Supp. 607, 610 (1984) (in those cases when "it appears that it would have been futile for plaintiffs to argue that the agency should not apply its own regulation"), or would be "inequitable and an insistence of a useless formality" as in the case where "there is no relief which plaintiff may be granted at the administrative level," <u>United</u>

States Cane Sugar Refiners' Ass'n v. Block, 3 CIT 196, 201, 544 F. Supp. 883, 887 (1982); (2) a subsequent court decision has interpreted existing law after the administrative determination at issue was published, and the new decision might have materially affected the agency's actions, see Timken, 10 CIT at 93, 630 F. Supp. at 1334; (3) the question is one of law and does not require further factual development and, therefore, the court does not invade the province of the agency by considering the question, see id.; R.R. Yardmasters of Am. v. Harris, 721 F.2d 1332, 1337-39 (D.C. Cir. 1983); and (4) the plaintiff had no reason to suspect that the agency would refuse to adhere to clearly applicable precedent. See Philipp Bros., Inc. v. United States, 10 CIT 76, 79-80, 630 F. Supp. 1317, 1321 (1986).

During the relevant period of time, Commerce's regulations provided for the filing of "case briefs" by interested parties after the publication of the preliminary results. See 19 C.F.R. §§ 353.38(c)(1)(ii) and (c)(2)(1996). The regulations specified that the "case briefs" had to contain all the arguments that, in the submitter's view, continued to be relevant to the final results. See id. In the Preliminary Results, Commerce stated that it "used sales to affiliated customers only where [Commerce] determined such sales were made at arm's-length prices, i.e., at prices comparable to prices at which the firm sold identical merchandise to

unaffiliated customers." 63 Fed. Reg. at 6515. Thus, NTN was on notice that if Commerce disregarded NTN's sales to affiliated customers, it would mean that Commerce had determined that such sales were not made at arm's length because they were made at prices that were not comparable to prices at which the firm sold identical merchandise to unrelated customers. See Def.'s Mem. at 54. Pursuant to Commerce's regulations, NTN was obligated to raise that issue in NTN's case brief. According to Commerce, "NTN's case brief, however, did not raise the affiliated party issue." Def.'s Mem. at 54 (citing NTN's Mem. Ex. 1). Commerce, therefore, asserts that: (1) "[i]t would[] . . . be unjust to Commerce to require the agency to waste public resources [by] addressing an issue which NTN had the opportunity to call to Commerce's attention, but failed to do so," Def.'s Mem. at 54 (citing Rhone Poulenc Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990)); and (2) "NTN should be barred from arguing, for the first time before this Court, that Commerce applied its arm's[-]length test erroneously." See id.

The Court disagrees. First of all, while NTN did not offer a lengthy discussion of the issue, see NTN's Reply at 11; NTN's Mem. Ex. 5, NTN provided Commerce with sufficient notice that the issue: (1) needs to be considered by Commerce; and (2) may be re-litigated at the Court. The purpose behind the doctrine of exhaustion is to prevent courts from premature involvement in administrative

proceedings, and to protect agencies "from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Abbott Labs. v. Gardner, 387 U.S. 136, 148-49 (1967); see also Public Citizen Health Research Group v. Comm'r, FDA, 740 F.2d 21, 29 (D.C. Cir. 1984) (pointing out that the "exhaustion doctrine . . . serv[es] four primary purposes: [(1)] it ensures that persons do not flout [legally] established administrative processes . . . ; [(2)] it protects the autonomy of agency decision-making; [(3)] it aids judicial review by permitting factual development [of issues relevant to the dispute]; and [(4)] it serves judicial economy by avoiding [repetitious] administrative and judicial fact-finding . . ." and by resolving sole claims without judicial intervention." Citation omitted).

While a plaintiff cannot circumvent the requirements of the doctrine of exhaustion by merely mentioning a broad issue  without raising a particular argument, plaintiff's brief statement of the argument is sufficient if it alerts the agency to the argument with reasonable clarity and avails the agency with an opportunity to address it.  See generally, Hormel v. Helvering, 312 U.S. 552 (1941); see also Rhone Poulenc, 899 F.2d at 1191.  An agency's failure to address plaintiff's challenge, however, does not invoke the exhaustion doctrine and shall not result in forfeiture of

plaintiff's judicial remedies. See generally, B-West Imports, Inc.
v. United States, 19 CIT 303, 880 F. Supp. 853 (1995).  An
administrative decision not to address the issue cannot be
dispositive of the question of whether or not the issue was
properly brought to the agency's attention.  See, e.g., Allnutt v.
United States DOJ, 2000 U.S. Dist. LEXIS 4060 (D. Md. 2000).

     Moreover, NTN is correct in its assertion that the issue
squarely falls within futility exception.   See Von Hoffburg v.
Alexander, 615 F.2d 633, 638 (1980) (stating that the exhaustion is
futile if an agency: (1) consistently applies the challenged policy
or methodology; (2) issues rules, regulations or bulletins
promulgating such policy or methodology; and (3) rejects similar
challenges); see also Rhone Poulenc, S.A., 7 CIT at 135, 583 F.
Supp. at 610; United States Cane Sugar Refiners' Ass'n, 3 CIT at
201, 544 F. Supp. at 887.  NTN brought the very same issue to
Commerce's attention twice before the review at issue was conducted
and, in each of those situations, Commerce refused to look at
factors other than price when determining price compatibility.  See
Final Results of Antidumping Duty Administrative Reviews of
Antifriction Bearings (Other Than Tapered Roller Bearings) and
Parts Thereof From France, Germany, Italy, Japan, Singapore, and
the United Kingdom, 62 Fed. Reg. 2081, 2122 (Jan. 15, 1997); Final
Results of Antidumping Duty Administrative Reviews and Partial

Termination of Administrative Reviews of Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, Germany, Italy, Japan, Singapore, Sweden, and the United Kingdom, 61 Fed. Reg. 66,472, 66,511 (Dec. 17, 1996). Therefore, the Court holds that not only did NTN sufficiently preserve the issue for consideration by this Court, but the exhaustion doctrine is inapplicable to the question of whether Commerce erred in its decision to disregard NTN's sales to affiliated customers in the calculation of NV.

### 2. COMMERCE'S DETERMINATION AT BAR

NTN argues that, in determining whether the prices were comparable, Commerce should not only have relied on whether or not the prices of the sales to affiliated parties were higher or lower than those of unrelated parties, but also should have examined other factors as well. See NTN's Mem. at 18. While the Court does not state that NTN's contention is entirely without merit, the Court cannot render Commerce's methodology or the reasoning underlying it unreasonable.[8] See NSK Ltd. v. United States, 21 CIT

---

[8] NTN cites to NEC Home Elecs. Ltd. v. United States, 22 CIT 167, 171, 3 F. Supp. 2d 1451, 1455 (1998), for the proposition that "a standard which did not take into account factors other than price was 'unreasonable and constitutes an abuse of discretion.'" NTN's Mem. at 19. NTN's reliance on NEC Home Elecs., 22 CIT at 171, 3 F. Supp. 2d at 1455, is, however, misplaced. The case applies to a scenario where the party being reviewed made no unrelated party sales, and, thus, the only price information it

617, 969 F. Supp. 34 (1997), rev'd on other grounds, NSK Ltd. v.
Koyo Seiko Co., 190 F.3d 1321 (Fed. Cir. 1999); NTN Bearing Corp.
of Am. v. United States, 19 CIT 1221, 1241, 905 F. Supp. 1083, 1100
(1995); Micron Tech., Inc. v. United States, 19 CIT 829, 846, 893
F. Supp. 21, 38 (1995); Usinor Sacilor v. United States, 18 CIT
1155, 1158, 872 F. Supp. 1000, 1004 (1994); accord Koyo Seiko, 36
F.3d at 1570 ("[A] court must defer to an agency's reasonable
interpretation of a statute even if the court might have preferred
another"); see also IPSCO, Inc., 965 F.2d at 1061.

### VIII.    Commerce's Use of Affiliated Supplier's Cost of Production for Inputs When the Cost Was Higher than the Transfer Price

#### A.    BACKGROUND

During the review at issue, Commerce used the higher of the
transfer price or the actual cost in calculating cost of production
("COP") and CV in situations involving inputs that NTN had obtained
from affiliated producers.  See Final Results, 63 Fed. Reg. at

---

... cont.

could produce was that of its sales to the related parties.  See
NEC Home Elecs., 22 CIT at 171, 3 F. Supp. 2d at 1455.  Thus, in
NEC Home Elecs.  The Court recognized that where there were no
sales to unaffiliated parties during the administrative review, it
would be impossible to make a comparison of prices charged to
unaffiliated parties with those charged to affiliated parties. In
this case, no such situation exists because NTN made sales to both
affiliated and unaffiliated parties during the administrative
review, and Commerce determined that the prices were not comparable
by comparing prices to affiliated and unaffiliated parties.

33,337.  Commerce explained its decision as follows:

> [Commerce] disagree[s] with NTN that [Commerce] should accept in all instances its reported transfer prices for transactions between affiliates.  Pursuant to [19 U.S.C. § 1677b(f)(3) (1994)], in the case of a transaction between affiliated persons involving the production of a major input, [Commerce] may consider whether the amount represented as the value of the major input is less than its cost of production.  In addition, [19 C.F.R. § 351.407 (1998) provides that] the value of a major input purchased from an affiliated person will be based on the higher of: (1) the price paid by the exporter or producer to the affiliated person for the major input; (2) the amount usually reflected in sales of the major input in the market under consideration; or (3) the cost to the affiliated person of producing the major input. We have relied upon this methodology in past AFB reviews as well as in other cases. . . .
>
> In this case, in [Commerce's] COP questionnaire [Commerce] asked NTN to provide a list of the major inputs it received from affiliated parties which it used to produce the merchandise under review.  NTN responded to the question by directing [Commerce] to several exhibits.  These exhibits listed the inputs NTN considered to be major inputs and provided the respective transfer prices and cost information for the inputs. [Commerce] examined this information and determined that in some instances the company's reported transfer prices were less than their respective COP.  As there were no other market prices available in most instances, [Commerce] restated NTN's COP and CV in the instances where the affiliated supplier's COP for inputs used to manufacture the merchandise under review was higher than the transfer price.

Id., 63 Fed. Reg. at 33,337 (assumed to be relying on Final Results of Antidumping Administrative Reviews of Certain Corrosion-Resistant Carbon Steel Flat Products and Certain Cut-to-Length Carbon Steel Plate From Canada, 62 Fed. Reg. 18,448 (Apr. 15, 1997)).

   B.    CONTENTIONS OF THE PARTIES

   NTN alleges that Commerce erroneously used the affiliated
supplier's COP for inputs when it was higher than the transfer
price.    See NTN's Mem. at 8, 20-21; NTN's Reply at 16-18.
Specifically, NTN maintains that Commerce misapplied 19 U.S.C. §
1677b(f)(3).    See id.

   Commerce contends that Commerce acted in accordance with the
statutory mandate and applied the provision reasonably under the
circumstances.    See Def.'s Mem. at 63-68.    Torrington supports
Commerce's position and asserts that Commerce properly restated
NTN's COP and CV in the instances where the affiliated supplier's
COP for inputs used to manufacture the merchandise was higher than
the transfer price.    See Torrington's Resp. at 27-29.

   C.    ANALYSIS

   The special rules for the calculation of COP and CV contained
in the pertinent provision state that, in a transaction between
affiliated persons, either the transaction or the value of a major
input may be disregarded.    See 19 U.S.C. § 1677b(f).    The part of
the statutory provision addressing transactions that may be
disregarded reads as follows:

       A transaction directly or indirectly between affiliated
       persons may be disregarded if, in the case of any element
       of value required to be considered, the amount
       representing that element does not fairly reflect the

amount usually reflected in sales of merchandise under consideration in the market under consideration.  If a transaction is disregarded under the preceding sentence and no other transactions are available for consideration, the determination of the amount shall be based on the information available as to what the amount would have been if the transaction had occurred between persons who are not affiliated.

19 U.S.C. § 1677b(f)(2).

The so-called "major input rule," or the part of the statutory provision addressing the value of a major input that may be disregarded, states, in turn, that,

[i]f, in the case of a transaction between affiliated persons involving the production by one of such persons of a major input to the merchandise, [Commerce] has reasonable grounds to believe or suspect that an amount represented as the value of such input is less than the cost of production of such input, then [Commerce] may determine the value of the major input on the basis of the information available regarding such cost of production, if such cost is greater than the amount that would be determined for such input under paragraph [19 U.S.C. § 1677b(f)(2)].

19 U.S.C. § 1677b(f)(3).

One of the elements of value to be considered in the calculation of COP, which is referred to in Section 1677b(f)(2), is the cost of manufacturing and fabrication.  See 19 U.S.C. § 1677b(b)(3)(A) (1994).  Section 1677b(b)(3)(A) shall be read in conjunction with 19 U.S.C. §§ 1677b(f)(2) and 1677b(f)(3) that authorize Commerce, in calculating COP and CV, to: (1) disregard a transaction between affiliated persons if the amount representing

an element does not fairly reflect the amount usually reflected in sales of merchandise under consideration in the market under consideration; and (2) determine the value of the major input on the basis of the information available regarding COP if Commerce has reasonable grounds to believe or suspect that an amount represented as the value of the input is less than the COP of the input.

In determining whether transaction prices between affiliated persons fairly reflect the market, Commerce's practice has been to compare the transaction prices with market prices charged by unrelated parties. Commerce's practice was later reduced to writing in 19 C.F.R. § 351.407 (1998), a regulation which implements 19 U.S.C. § 1677b(f). Commenting on the regulation, Commerce stated that it

> believes that the appropriate standard for determining whether input prices are at arm's length is its normal practice of comparing actual affiliated party prices to or from unaffiliated parties. This practice is the most reasonable and objective basis for testing the arm's length nature of input sales between affiliated parties, and is consistent with [19 U.S.C. § 1677b(f)(2).

Def.'s Mem. at 61 n. 16.

Pursuant to the major input rule contained in 19 U.S.C. § 1677b(f)(3), in calculating COP or CV, Commerce values a major input purchased from an affiliated supplier using the highest of the following: (1) the transfer price between the affiliated

parties; (2) the market price between unaffiliated parties; (3) and the affiliated supplier's COP for the major input, see, e.g., Final Results of Antidumping Duty Administrative Review of Silicomanganese From Brazil, 62 Fed. Reg. 37,869, 37,871-72 (July 15, 1997); Notice of Final Determination of Sales at Less Than Fair Value: Certain Steel Concrete Reinforcing Bars From Turkey, 62 Fed. Reg. 9737, 9746 (Mar. 4, 1997); Previous ruling, 62 Fed. Reg. at 2115, since, in Commerce's view, the affiliation between the respondent and its suppliers "creates the potential for the companies to act in a manner that is other than arm's length" and gives Commerce reason to analyze the transfer prices for major inputs. Def.'s Mem. at 62-63. In addition, if Commerce disregards sales that failed the below-cost sales test pursuant to 19 U.S.C. § 1677b(b)(1) in the prior review with respect to merchandise of the respondent being reviewed, Commerce, has "reasonable grounds to believe or suspect" that sales under consideration might have been made at prices below the COP. See 19 U.S.C. § 1677b(b)(2)(A)(ii) (1994).

Commerce disregarded sales that failed its cost test under 19 U.S.C. § 1677b(b) (1994) during the previous review with respect to NTN's merchandise. For this reason, Commerce concluded that it had reasonable grounds to believe or suspect that sales of the foreign like product under consideration may have been made at prices below

the COP.    Accord 19 U.S.C. § 1677b(b)(2)(A)(ii).    Therefore,
Commerce initiated a COP investigation of sales by NTN in the home
market. See Preliminary Results, 63 Fed. Reg. at 6515. As part of
its investigation, Commerce distributed a questionnaire, which, in
pertinent part, requested NTN to provide COP and CV information.
See Def.'s Mem. at 63.  Specifically, Commerce requested NTN to:
(1) list all inputs used to produce the merchandise under review;
(2) identify those inputs that NTN received from affiliated
persons; (3) provide the name of the affiliated persons from whom
each input was received; (4) list the major inputs received from
affiliated persons and used to produce the merchandise under
review; and (5)  provide the per unit cost of production incurred
by the affiliated person in producing the major input and to
specify the basis used by NTN to value each major input for
purposes of computing the submitted COP and CV amounts.  See id.
In response, NTN referred Commerce to a number of NTN's exhibits
and stated, among other things, that transfer price was used in
computing COP and CV. See Def.'s Mem. Ex. 1 (proprietary version).
NTN also indicated that, for submission purposes, NTN used the
transfer price for transactions with affiliated persons regardless
of whether the transfer price was above or below the suppliers
actual COP or above or below market prices. See Def.'s Mem. at 64.
Therefore, consistent with its interpretation of 19 U.S.C. §§
1677f(2) and 1677f(3), Commerce used the higher of the transfer

price or the actual cost in calculating COP and CV in the situations where NTN used parts purchased from affiliated persons. See Final Results, 63 Fed. Reg. at 33,337.

While NTN argues that there is no record evidence that the affiliated party inputs did not "fairly reflect the amount usually reflected in the sales of merchandise under consideration" and that the statute makes no reference to cost, see NTN's Mem. at 20 (relying on 19 U.S.C. § 1677b(f)(2)), the Court holds that Commerce acted reasonably and in accord with 19 U.S.C. § 1677b(f)(3) when it chose to determine the value of a major input on the basis of the information available regarding COP. See Final Results, 63 Fed. Reg. at 33,337; accord NTN Bearing Corp. of Am., 26 CIT ___, 186 F. Supp. 2d 1257; SKF USA Inc. v. United States, 24 CIT ___, 116 F. Supp. 2d 1257 (2000); Timken Co. v. United States, 21 CIT 1313; 989 F. Supp. 234 (1997).

Alternatively, NTN argues that 19 U.S.C. § 1677b(f)(3) does not support Commerce's methodology because the use of 19 U.S.C. § 1677b(f)(3) is only permitted for "major inputs" and Commerce applied the major input rule to any input from an affiliated person, thus failing to discriminate between major and minor inputs. See NTN's Mem. at 20-21. The Court agrees. Commerce's methodology lacks any stated reasoning as to why the "major input rule" should apply to minor inputs. See Torrington Co. v. United

States, 25 CIT ___, 146 F. Supp. 2d 845 (2001). While the Court is unaware as to what extent these particular shortcomings of Commerce's methodology affected the determination at bar, the Court disagrees with Commerce's conclusion that the determination at issue was not erroneous simply because NTN's brief filed with this Court has failed to point to a specific "minor" input for which Commerce actually used COP rather than transfer value. If NTN provided Commerce with sufficient record evidence to discriminate between "major" and "minor" inputs, it was Commerce's obligation to either: (1) exclude "minor" inputs from the reach of Commerce's methodology reserved for "major" inputs; or (2) articulate why Commerce's "major input" methodology is equally applicable to "minor" or any inputs. Therefore, the Court: (1) affirms Commerce's decision to use NTN's affiliated supplier's COP for major inputs when COP was higher than the transfer price; and (2) remands the issue to Commerce with regard to NTN's minor inputs so Commerce would: (a) either provide the Court with a sufficient and reasonable explanation of Commerce's methodology; or (b) if Commerce is unable to do so, amend Final Results, 63 Fed. Reg. 33,320, accordingly.

IX.  COMMERCE'S RECALCULATION OF NTN'S UNITED STATES INDIRECT
     SELLING EXPENSES WITHOUT REGARD TO LEVELS OF TRADE

     During the review, Commerce used NTN's United States indirect

selling expenses as reported by NTN.  See Preliminary Results, 63

Fed. Reg. at 6515.  Consequently, Torrington asserted that Commerce

should not use NTN's United States selling expenses based on LOTs

because, according to Torrington, NTN's reporting rationale was not

supported by the record.  See Def.'s Mem. at 66.  Commerce agreed

with Torrington and observed that

     due to a ministerial error, [Commerce] did not revise
     NTN's reporting of U.S. indirect selling expenses for
     [Preliminary Results, 63 Fed. Reg. at 6515]. [Commerce]
     ha[s] corrected the problem for [Final Results, 63 Fed.
     Reg. at 33,320].

Id. at 66-67 (citing Mem. from Greg Thompson, May 20, 1999).


     NTN alleges that in the Final Results, 63 Fed. Reg. at 33,329,

Commerce erroneously recalculated NTN's United States indirect

selling expenses without regard to LOTs.  See NTN's Mem. at 5, 21-

22.  Commerce maintains that the amendment by Commerce entered in

accordance with Memorandum by Greg Thompson was supported by

substantial evidence on the record.  See Def.'s Mem. at 67.

Torrington supports Commerce's position.  See Torrington's Resp. at

29-31 (citing NTN Bearing Corp. of Am., 19 CIT at 1233-35, 905 F.

Supp. at 1094-95).


     The Court agrees with NTN's observation that it would be

anomalous for Commerce to determine that there were different LOTs in the United States and Japanese markets for NTN's sales of subject merchandise while, at the same time, allocate NTN's indirect selling expenses without regard to LOTs if, and only if, Commerce could actually match and compare the LOTs at issue. NTN, purports to show this Court its entitlement to the adjustment through a hypothesis, but NTN does not show that its allocation methodology actually quantifies the United States indirect selling expenses incurred at different LOTs. Cf. NSK Ltd., 25 CIT ___, 170 F. Supp. 2d 1280; NTN Bearing Corp. of Am., 24 CIT at ___, 104 F. Supp. 2d at 131-33; NTN Bearing Corp. of Am., 19 CIT at 1233-34, 905 F. Supp. at 1094-95; NSK Ltd., 21 CIT at 635, 969 F. Supp. at 54. In the case at bar, the only quantification of the expenses offered by NTN is the allocation itself. Therefore, Commerce's decision to recalculate NTN's United States indirect selling expenses without regard to LOTs is affirmed.

**X.    Commerce's Calculation of Normal Value Based on
       Sales of Identical or Similar Merchandise Before
       Resorting to Constructed Value in Instances
       Where Below-Cost Sales Were Disregarded**

   **A.    BACKGROUND**

Based upon the pre-URAA version of the antidumping law, the CAFC held in CEMEX, S.A., 133 F.3d at 904, that the plain language of 19 U.S.C. § 1677(16) (1988) requires Commerce to base foreign

market value ("FMV"), a factor analogous to NV, on nonidentical but similar merchandise, rather than CV, when sales of identical merchandise have been found to be outside the ordinary course of trade.  After the enactment of the URAA, Pub. L. No. 103-465, 108 Stat. 4809, Commerce continued its policy of using CV when it disregarded below-cost sales from the calculation of NV.  However, Commerce invited interested parties to comment upon the applicability of <u>CEMEX, S.A.</u>, 133 F.3d 897, to the review.  <u>See Preliminary Results</u>, 63 Fed. Reg. at 6515.  After consideration of the parties' comments, Commerce stated its position:

> [Commerce] has reconsidered its practice as a result of the <u>CEMEX</u> decision and has determined that it would be inappropriate to resort directly to CV as the basis for normal value if [Commerce] finds sales of the most similar merchandise to be outside the "ordinary course of trade."  Instead, [Commerce] will use sales of other similar merchandise, if such sales exist. [Commerce] will use CV as the basis for normal value only when there are no above-cost sales of a foreign[-]like product that are otherwise suitable for comparison.
>
>        . . . [The CAFC] stated in <u>CEMEX</u>[, 133 F.3d at 904] that "[t]he language of the statute requires Commerce to base foreign market value on nonidentical but similar merchandise . . . , rather than constructed value when sales of identical merchandise have been found to be outside the ordinary course of trade."  . . .  There was no cost test in <u>CEMEX</u> and <u>CEMEX</u> was under the pre-URAA statute. However, under the URAA, below-cost sales in substantial quantities and within an extended period of time are outside the ordinary course of trade and [Commerce] disregard[s] them from consideration. Therefore, in order to be consistent with <u>CEMEX</u> for these final results, when making comparisons in accordance with section [19 U.S.C. § 1677(16)], [Commerce] considered all products sold in the home market that were comparable to merchandise within the scope of each order and which were

sold in the ordinary course of trade for purposes of determining appropriate product comparisons to U.S. sales. Where there were no sales of identical merchandise in the home market made in the ordinary course of trade to compare to U.S. sales, [Commerce] compared U.S. sales to sales of the most similar foreign[-]like product made in the ordinary course of trade. Only where there where no sales of foreign[-]like product in the ordinary course of trade did [Commerce] resort to CV.

Final Results, 63 Fed. Reg. at 33,332.

### B.    CONTENTIONS OF THE PARTIES

NTN contends that the change of Commerce's model-matching methodology was based upon an erroneous reading of CEMEX, S.A., 133 F.3d at 904, and that Commerce's changed methodology is inconsistent with the current statutory scheme. See NTN's Mem. at 22-24. Therefore, NTN concludes that Commerce erroneously failed to base NV on CV after disregarding below-cost sales from the calculation of NV. See id. at 22-24.

Commerce maintains that CEMEX, S.A., 133 F.3d at 904, lends support to Commerce's changed position taken in the Final Results, 63 Fed. Reg. at 33,332. See Def.'s Mem. at 70. Commerce further asserts that, although the URAA made changes to the antidumping law, the changes made to the relevant statutory provisions did not render CEMEX, S.A., 133 F.3d at 904, inapplicable. See id. Torrington supports Commerce's position and observes that Commerce's recalculation was in accordance with the post-URAA law.

See Torrington's Resp. at 32.


    **C.** **ANALYSIS**

The pre-URAA antidumping law provided that FMV of imported merchandise shall be the price at which such or similar merchandise is sold in the usual commercial quantities and in the ordinary course of trade for home consumption. See 19 U.S.C. § 1677b(a)(1) (1988). The term "such or similar merchandise" was defined as merchandise in the first of three specifically provided categories in respect to which a determination could be satisfactorily made. See 19 U.S.C. § 1677(16) (1988). While the first of these categories applied to "such" or identical merchandise, the second and third ones covered "similar" or like merchandise. See 19 U.S.C. §§ 1677(16)(A), (B), and (C). The term "ordinary course of trade" was, in turn, defined as "the conditions and practices which, for a reasonable time prior to the exportation of the subject merchandise, have been normal in the trade under consideration with respect to merchandise of the same class or kind." 19 U.S.C. § 1677(15) (1988). The definition of "ordinary course of trade," however, was not held to exclude below-cost sales. See Torrington Co. v. United States, 127 F.3d 1077, 1081 (Fed. Cir. 1997) ("Under this definition, an enterprise may indeed make some sales below cost 'in the ordinary course of trade.' For instance, a commodity might be sold below cost as part of a

customer incentives program or as part of a volume discount or package deal").

The post-URAA antidumping law introduced a number of changes. Specifically, it provided that NV shall be the price at which the foreign-like product was first sold for consumption in the exporting country, in the usual quantities and in the ordinary course of trade. See 19 U.S.C. § 1677b(a)(1)(B)(i) (1994). The term "foreign[-]like product" was, in turn, defined as merchandise in the first of three specified categories in respect to which a determination can be satisfactorily made. See in 19 U.S.C. § 1677(16) (1994). In a way analogous to the pre-URAA law, the first of these categories applied to identical merchandise, that is, "subject merchandise and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise," id., and the second and third categories covered "like" merchandise. The term "ordinary course of trade" was defined as "the conditions and practices which, for a reasonable time prior to the exportation of the subject merchandise, have been normal in the trade under consideration with respect to merchandise of the same class or kind." 19 U.S.C. § 1677(15) (1994).

Thus, the only essential difference between the pre-URAA definition was a new provision that reads as follows: "[Commerce]

shall consider the following sales and transactions, among others, to be outside the ordinary course of trade: (A) Sales disregarded under [19 U.S.C. § 1677b(b)(1); and] (B) Transactions disregarded under [19 U.S.C. § 1677b(f)(2)]." 19 U.S.C. § 1677(15) (1994). In other words, under the post-URAA law, Commerce must, much in the fashion of the pre-URAA law, first look to identical merchandise when Commerce is matching the United States model to the comparable home market model. See 19 U.S.C. §§ 1677b(a)(1) and 1677(16) (1994). If a determination cannot be satisfactorily made using identical merchandise, then Commerce must look to "like" merchandise first under category 19 U.S.C. § 1677(16)(B) and, if that is not available, under the category designated in 19 U.S.C. § 1677(16)(C). Accord CEMEX, S.A., 133 F.3d at 904. The additional new distinction, the one providing that Commerce must now exclude below-cost sales or transactions disregarded under 19 U.S.C. §§ 1677b(b)(1) or 1677b(f)(2) if Commerce is involved in the process of selecting home market model matches, does not affect the statutory hierarchy for selecting the "foreign[-]like product" articulated in 19 U.S.C. § 1677(16). See 19 U.S.C. § 1677(15) (1994). Thus, there is nothing in the post-URAA law or in CEMEX, S.A., 133 F.3d at 904, that would preclude the applicability of CEMEX, S.A., 133 F.3d at 904, to the post-URAA legal format. Consequently, the Court holds that Commerce properly changed its methodology to conform to CEMEX, S.A., 133 F.3d at 904, after the

adoption of the post-URAA law.

Under the post-URAA law, when below-cost sales are disregarded, "normal value shall be based on the remaining sales of the foreign[-]like product in the ordinary course of trade. If no sales made in the ordinary course of trade remain, the normal value shall be based on the constructed value of the merchandise." 19 U.S.C. § 1677b(b)(1) (1994). NTN derives from this statement that Commerce must base NV upon CV of the merchandise if the identical merchandise is not sold in the ordinary course of trade because such merchandise is below-cost and disregarded in accordance with 19 U.S.C. § 1677b(b)(1). See NTN's Mem. at 23. The Court is not convinced. NTN ignores the definition of the "foreign-like product" contained in 19 U.S.C. § 1677(16), which requires Commerce to look for "like" merchandise if the identical merchandise is not available (for example, if the merchandise is not sold in the ordinary course of trade).[9] Pursuant to 19 U.S.C. § 1677(16), if

---

[9] NTN's reliance upon the SAA is similarly misplaced. See NTN's Mem. at 24. The SAA merely provides that Commerce shall resort to CV if there are no above-cost sales in the ordinary course of trade in the foreign market under consideration. See H.R. Doc. 103-316 at 833, reprinted in 1994 U.S.C.C.A.N. at 4170-71. The absence of sales of the identical or similar merchandise in the ordinary course of trade in the foreign market under consideration does not necessarily mean absence of above-cost sales in the ordinary course of trade in the foreign market. As Commerce correctly observes, there still may be above-cost sales of other "like" merchandise in the ordinary course of trade. See Def.'s Mem. at 73-74.

"like" merchandise meets the ordinary course of trade definition, it must be used as a comparison model before resorting to CV. Therefore, the Court upholds Commerce's decision to calculate NV based on sales of identical or similar merchandise before resorting to CV in instances where below-cost sales were disregarded.

## XI.  Commerce's Decision to Disallow a Claim for a Level-of-Trade Adjustment

### A.    BACKGROUND

#### 1.    FACTUAL BACKGROUND

In investigating whether the various respondents were entitled to an LOT adjustment, Commerce relied on the CEP price, that is, the price to the first unaffiliated purchaser in the United States, adjusted for expenses associated with economic activities in the United States, for the purposes of determining the LOT of CEP sales.  See Final Results, 63 Fed. Reg. at 33,331.  Based upon the selling functions reported by the respondents, Commerce found that, with the exception of one particular respondent, no respondent had a home market LOT equivalent to the CEP LOT.  See Def.'s Mem. at 74.  Because the CEP LOT was different from the LOTs in the home market, Commerce concluded that there was no appropriate basis for Commerce to determine an LOT adjustment.  See id.  Subsequently, upon its determination that the home market was at a more advanced stage of distribution than the CEP LOT, Commerce made a CEP offset

pursuant to 19 U.S.C. § 1677b(a)(7)(B).  See Final Results, 63 Fed.

Reg. at 33,330.


### 2.   STATUTORY BACKGROUND

The URAA amended the antidumping law to include specific LOT

provisions.  Instead of FMV under 19 U.S.C. § 1677b (1988), the

statute now provides for NV, which is defined as "the price at

which the foreign[-]like product is first sold (or, in the absence

of a sale, offered for sale) for consumption in the exporting

country, in the usual commercial quantities and in the ordinary

course of trade and, to the extent practicable, at the same level

of trade as the export price or constructed export price . . . ."

19 U.S.C. § 1677b(a)(1)(B)(i) (1994).  The statute also provides

for an LOT adjustment to NV if certain conditions are met.

Specifically, the  provision states that

> [t]he price described in paragraph (1)(B) shall also be
> increased or decreased to make due allowance for any
> difference (or lack thereof) between the export price or
> constructed export price and the price described in
> paragraph (1)(B) (other than a difference for which
> allowance is otherwise made under this section) that is
> shown to be wholly or partly due to a difference in level
> of trade between the export price or constructed export
> price and normal value, if the difference in level of
> trade--
>
> > (i) involves the performance of different
> > selling activities; and
>
> > (ii)  is  demonstrated  to  affect  price
> > comparability,  based  on  a  pattern  of
> > consistent price differences between sales at

        different levels of trade in the country in
        which normal value is determined.

19 U.S.C. § 1677b(a)(7)(A) (1994).


    Additionally, the statute provides for an adjustment known as

the CEP offset, which is allowed in the following situations:

        When normal value is established at a level of trade
        which constitutes a more advanced stage of distribution
        than the level of trade of the constructed export price,
        but the data available do not provide an appropriate
        basis to determine under subparagraph (A)(ii) a level of
        trade adjustment, normal value shall be reduced by the
        amount of indirect selling expenses incurred in the
        country in which normal value is determined on sales of
        the foreign[-]like product but not more than the amount
        of such expenses for which a deduction is made under [19
        U.S.C. § 1677a(d)(1)(D)].

19 U.S.C. § 1677b(a)(7)(B) (1994).


    Thus, the statutory scheme provides that the first step in the

LOT methodology is to determine CEP.  CEP, in turn, is defined as

        the price at which the subject merchandise is first sold
        (or agreed to be sold) in the United States . . . by or
        for the account of the producer or exporter of such
        merchandise or by a seller affiliated with the producer
        or exporter, to a purchaser not affiliated with the
        producer or exporter, as adjusted under subsections (c)
        and (d) . . . .

19 U.S.C. § 1677a(b).


    Subsection (c), in turn, covers various expenses that are to

be deducted from both EP and CEP, while subsection (d) applies to

expenses that are incurred between importation and resale as well

as to profit allocated to the expenses that shall be deducted from

CEP only.  See 19 U.S.C. § 1677a(c) and (d).  In determining the CEP level of trade, Commerce begins with the starting price to the first unaffiliated purchaser and then deducts from it the expenses incurred between importation and resale, that is, the expenses provided for in subsection (d) of 19 U.S.C. § 1677a.[10]  The next

---

[10]

Furthermore, the SAA provides that

under [19 U.S.C. § 1677a(d)], constructed export price will be calculated by reducing the price of the first sale to an unaffiliated customer in the United States by the amount of the following expenses (and profit) associated with economic activities occurring in the United States: (1) any commissions paid in selling the subject merchandise; (2) any expenses which result from, and bear a direct relationship to, selling activities in the United States; (3) any selling expenses which the seller pays on behalf of the purchaser . . . ; (4) any "indirect selling expenses" (defined as selling expenses not deducted under any of the first three categories of deductions); (5) any expenses resulting from a manufacturing process or assembly performed on the merchandise after its importation into the United States . . . ; and (6) an allowance . . . for profit allocable to the selling, distribution, and further manufacturing expenses incurred in the United States. The deduction of profit is a new adjustment in U.S. law, . . . which reflects that constructed export price is now calculated to be, as closely as possible, a price corresponding to an export price between non-affiliated exporters and importers.

H.R. Doc. 103-316 at 823, reprinted in 1994 U.S.C.C.A.N. at 4163.

The items listed in (1) through (6) are the same expenses and profit that are deductible from the starting price or the price to the first unaffiliated purchaser in the United States.  The deduction from the CEP starting price of those expenses associated with economic activities in the United States, that is, subsection (d) deductions, results in the construction of a hypothetical transaction price that would likely have been charged to the first purchaser in the United States had that purchaser been unaffiliated

step in the LOT determination process is to determine whether there are sales in the home market at the same LOT as the adjusted CEP sales.  The statute does not indicate how to find matching LOTs.  However, the SAA indicates that in order to find that two LOTs are different, one requisite factor is "a difference between the actual functions performed by the sellers at the different levels of trade in the two markets."  H.R. Doc. 103-316 at 829, reprinted in 1994 U.S.C.C.A.N. at 4168.

In determining whether such a difference exists, Commerce reviews the selling functions remaining in the CEP transaction data after the deduction of subsection (d) expenses and examines NV data for evidence of similar selling functions.  See 19 U.S.C. § 1677b(a)(1)(B) (1994), 19 C.F.R. § 351.412(c)(1)(ii) (1998).

If it is not possible to find sales in the home market at the same LOT as the adjusted CEP sales, the next step for Commerce is to consider whether an LOT adjustment is appropriate.  In determining whether to make the adjustment, Commerce must make certain that the different LOTs involve different selling functions and that the different LOTs are associated with a consistent pattern of price differences.  See 19 U.S.C. § 1677b(a)(7)(A).  If

---

... cont.

to the exporter.

the LOTs in the home market do not evidence a consistent pattern of price differences, no adjustment for LOT is permitted. Conversely, when the LOT adjustment is applicable and quantifiable, Commerce must make an adjustment for the entire price effect of the difference in LOTs. If, in reviewing price information in the home market, Commerce is not able to quantify price differences between the CEP LOT and the LOT of the comparison sales, and if NV is established at a more advanced stage of distribution than the CEP LOT, then Commerce must make a CEP offset. See 19 U.S.C. § 1677b(a)(7)(B).

### B.   CONTENTS OF THE PARTIES

NTN argues that Commerce's methodology for conducting the LOT analysis was not in accordance with law. See NTN's Mem. at 5, 24-29. Specifically, NTN: (1) argues that Commerce erred by determining the CEP LOT after deducting expenses and profit pursuant to 19 U.S.C. § 1677b(d); and (2) offers an alternative methodology. See NTN's Mem. at 24-27 (citing Micron Tech., Inc. v. United States, 23 CIT 208, 40 F. Supp. 2d 481 (1999), and Borden, Inc. v. United States, 22 CIT 233, 4 F. Supp. 2d 1221 (1998)).

### C.   ANALYSIS

Pursuant to Commerce's LOT methodology, which reflects Commerce's interpretation of the statutory LOT provisions, as

defined by the SAA, Commerce determined the CEP LOT for NTN's CEP

transactions by using the starting price to the first unaffiliated

purchaser in the United States, adjusted for the expenses and

profit in accordance with 19 U.S.C. § 1677a(d).  See Final Results,

63 Fed. Reg. 33,331.  Commerce explained its action as follows:

> The statutory definition of "constructed export price"
> contained [in 19 U.S.C. § 1677a(d)] indicates clearly
> that [Commerce is] to base CEP on the U.S. resale price
> adjusted for U.S. selling expenses and profit.  As such,
> the CEP reflects a price exclusive of all selling
> expenses and profit associated with economic activities
> occurring in the United States. These adjustments are
> necessary in order to arrive at, as the term CEP makes
> clear, a "constructed" export price. The adjustments
> [Commerce] make[s] to the starting price, specifically
> those made pursuant to [19 U.S.C. § 1677a] ("Additional
> Adjustments for Constructed Export Price"), normally
> change the level of trade.  Accordingly, [Commerce] must
> determine the level of trade of CEP sales exclusive of
> the expenses (and concomitant selling functions) that
> [Commerce] deduct[s] pursuant to this subsection.

Final Results, 63 Fed. Reg. at 33,331-32 (internal citation

omitted).

The Court finds Commerce's course of action reasonable in view

of the statutory scheme and the existing alternatives.

First, the pertinent statute requires a comparison between the

NV and the EP or CEP when Commerce makes allowances for differences

in LOTs.  See 19 U.S.C. § 1677b(a)(7)(A).  Accordingly, Section

1677a(b) refers to CEP as the price to the unaffiliated purchaser

"as adjusted."  Reading these provisions together, Commerce

reasonably concluded that the statute implies an obligation on the

part of Commerce to determine NV at the LOT of the adjusted price to the first unaffiliated purchaser in the United States, creating a coherent pattern of actions.

Second, 19 U.S.C. § 1677a(d)(1) requires deductions to be made to the resale prices charged by the distributors (that are related to foreign exporters) to the unaffiliated purchasers in the United States. As the SAA explains, the purpose of these deductions is to convert the price charged by the related reseller "[into] a price corresponding to an export price between [a] non-affiliated exporter[] and importer[]" with the utmost possible precision. See H.R. Doc. 103-316 at 823, reprinted in 1994 U.S.C.C.A.N. at 4163. Thus, the intended effect of these deductions is to change the LOT of the sales in the United States, tying them to a particular stage in the chain of distribution.

Addressing the issue as to why this approach in determining the basis for the LOT analysis is preferable to an approach that relies on the starting price for all transactions, that is, CEP, EP, and NV, Commerce explained that,

> [i]f the starting price is used for all U.S. sales, [Commerce's] ability to make meaningful comparisons at the same level of trade (or appropriate adjustments for differences in levels of trade) would be severely undermined in cases involving CEP sales. [Usage of] the starting price to determine the level of trade of both types of U.S. sales would result in a finding of different levels of trade for an EP sale and a CEP sale adjusted to a price that reflected the same selling functions. Accordingly, [Commerce adopted] the

regulations [that] specify that the level of trade analyzed for EP sales is that of the starting price, and for CEP sales it is the constructed level of trade of the price after the deduction of U.S. selling expenses and profit.

Notice of proposed rulemaking and request for Public Comments on Antidumping Duties; Countervailing Duties, 61 Fed. Reg. 7308, 7347 (Feb. 27, 1996).

In other words, the adjustments Commerce makes to the CEP starting price pursuant to subsection (d) of Section 1677a normally changes the LOT. By deducting subsection (d) expenses prior to performing the LOT analysis, Commerce is making it possible to identify the same LOT for comparable EP and CEP transactions.

Since the post-URAA envisions no "automatic EP offset," but rather a statutory scheme that frequently balances the deductions from the resale price in the United States, the CEP prices, as adjusted, are also envisioned to be compared, to the extent practicable, to prices in the home market based upon the same LOT. When that is not practicable, and the difference in LOT affects price comparability, an LOT adjustment is provided. Consequently, the CEP offset is available as a default alternative when the home market sales are at a different LOT but there is not sufficient data to determine whether the difference in LOTs affects price comparability. Accord Def.'s Mem. at 83-84.

The approach suggested by NTN bypasses the above-described

steps of the post-URAA statutory scheme by failing to take into account the effect ensuing from the difference in LOT which, in turn, affects the CEP deductions.  Under NTN's suggested methodology, these deductions, however great, cannot create a difference in LOT between the adjusted CEP sales and those sales in the home market that have the same selling expenses as the United States sales (that is, home market sales through related resellers) because, under NTN's scheme, the LOT of the sales in the United States would be determined before the CEP deductions.  Therefore, NTN's approach would: (1) require Commerce to choose home market sales at the same LOT as that of the unadjusted price in the United States; and (2) prevent any significant adjustments to NV (whether by means of LOT adjustment or CEP offset) since both types of adjustments are limited to situations in which there is difference in LOT, and, under NTN's scheme, the home market sales would be at the same LOT as the sales in the United States (that is, home market sales through related resellers).

Furthermore, if Commerce is to accept NTN's approach, while there will always be substantial deductions from the resale prices in the United States (because they are mandatory), these prices will be compared to resale prices in the home market from which there will virtually never be any equivalent deductions. Consequently, a substantial imbalance would be created, and the CEP deductions often will convert the resale price in the United States

into an original manufacturer's price with virtually no selling
expenses.  In other words, the resale price would then be compared
to the unadjusted price charged in the home market, violating the
gist of the statutory scheme.

The post-URAA statute is designed to replace the automatic
offset with one that is corrected for differences in LOT, when
these differences could be shown to have affected price
comparability.  As the SAA explains,

> [the statutory scheme] provides that, where authorities
> use a constructed export price and the use of such a
> price results in the comparison of sales at different
> levels of trade, authorities shall either (1) establish
> the normal value at a level of trade equivalent to the
> level of trade of the constructed export price; or (2)
> make due allowance as warranted.  The statutory scheme .
> . . is designed to ensure that a proper comparison is
> made.

H.R. Doc. 103-316 at 829, reprinted in 1994 U.S.C.C.A.N. at 4167.

Since the statute requires Commerce to establish normal value
"to the extent practicable, at the same level of trade as the
export price or constructed export price," 19 U.S.C. §
1677b(a)(1)(B)(i), and the term "the same level of trade" is taken
to mean comparable marketing stages in the home and United States
markets, see Micron Tech., Inc. v. United States, 243 F.3d 1301,
1305 (Fed. Cir. 2001) (citing to 19 C.F.R. § 351.412(c)(2)), the
Court finds that it was reasonable for Commerce to determine the
CEP LOT for NTN's CEP transactions by using the starting price to

the first unaffiliated purchaser in the United States, adjusted for

expenses and profit in accordance with 19 U.S.C. § 1677a(d). See

Micron Tech., 243 F.3d 1301; Borden, Inc. v. United States, 2001

U.S. App. LEXIS 4170 (Fed. Cir. 2001).

## XII. Commerce's Decision to Calculate Constructed Export Price Profit Without Regard to Levels of Trade

### A. STATUTORY BACKGROUND

According to 19 U.S.C. 1677a(d)(3) (1994), in calculating CEP,

Commerce must deduct "the profit allocated to the expenses

described" in pertinent subparts of 19 U.S.C. § 1677a(d) from the

price at which the merchandise is sold to the first unaffiliated

purchaser in the United States. The term "profit" is defined as

"an amount determined by multiplying the total actual profit by the

applicable percentage." 19 U.S.C. § 1677a(f)(1) (1994). The term

"actual profit" is, in turn, defined as the "total profit earned .

. . with respect to the sale of the same merchandise for which

total expenses are determined under such subparagraph." 19 U.S.C.

§ 1677a(f)(2)(D) (1994). Finally, the term "total expenses" is

defined as

> all expenses in the first of the following categories
> which applies and which are incurred by or on behalf of
> the foreign producer and foreign exporter of the subject
> merchandise and by or on behalf of the United States
> seller affiliated with the producer or exporter with
> respect to the production and sale of such merchandise:
>
> (i) The expenses incurred with respect to the

subject merchandise sold in the United States
and the foreign[-]like product sold in the
exporting country if such expenses were
requested by the administering authority for
the purpose of establishing normal value and
constructed export price.

(ii) The expenses incurred with respect to the
narrowest category of merchandise sold in the
United States and the exporting country which
includes the subject merchandise.

(iii) The expenses incurred with respect to
the narrowest category of merchandise sold in
all countries which includes the subject
merchandise.

19 U.S.C. § 1677a(f)(2)(C).


**B.   FACTUAL BACKGROUND**

In the preliminary results, Commerce calculated CEP profit
without regard to LOTs.  See NTN's Mem. at 29.  Consequently, NTN
contended that Commerce should calculate CEP profit on an LOT basis
because, under the preference expressed by the language of 19
U.S.C. § 1677b(f), NTN profit should have been calculated on the
narrowest possible basis.  Torrington, in turn, contended that
Commerce should follow the determination made in Preliminary
Results, 63 Fed. Reg. at 6512 because the statute refers to the
"'narrowest' group of products only when the groups are broader
than the subject merchandise involved."  Final Results, 63 Fed.
Reg. at 33,345.  Commerce agreed with Torrington and stated that

> NTN's reliance on the "narrowest" language [of 19 U.S.C.
> § 1677b(f)(2)(C)(ii)] is misplaced . . . .  That language

addresses only the second alternative basis for the
profit calculation, whereas here [Commerce] rel[ies] on
the first alternative. Moreover, neither the statute nor
the SAA requires [Commerce] to calculate CEP profit using
any of the alternatives on a basis more specific than
subject merchandise and foreign[-]like product . . . .
Thus, [Commerce] ha[s] not adopted NTN's suggestion.

Final Results, 63 Fed. Reg. at 33,345-46.

Addressing the issue, Commerce specifically pointed out that:
(1) neither the statute nor the SAA requires that the CEP profit be
based upon a more specific category than the class or kind of
merchandise; and (2) basing the profit calculation on an LOT basis
would "add a layer of complexity to an already complicated exercise
with no increase in accuracy." Final Results of Antidumping Duty
Administrative Reviews of Antifriction Bearings (Other Than Tapered
Roller Bearings) and Parts Thereof From France, Germany, Italy,
Japan, Romania, Singapore, Sweden and the United Kingdom, 62 Fed.
Reg. 54,043, 54,072 (Oct. 17, 1997). Commerce further explained
its position by stating that

neither the statute nor the SAA requires [Commerce] to
calculate CEP profit on bases more specific than the
subject merchandise as a whole. . . . [NTN's]
suggest[ed] [approach] would add a layer of complexity to
an already complicated exercise with no [guarantee that
the result will provide an] increase in accuracy.
Furthermore, a subdivision of the CEP-profit calculation
would be more susceptible to manipulation.

Id. at 54,072.

C.    **CONTENTIONS OF THE PARTIES**

NTN asserts that Commerce's calculation of CEP profit without regard to LOTs was not in accordance with law.  <u>See</u> NTN's Mem. at 9, 29-30.  NTN argues that the statute expresses a preference for the CEP profit calculation to be performed as specifically as possible.  <u>See</u> NTN's Mem. at 29.

Commerce maintains that the calculation of NTN's CEP profit is in accordance with law since the statute does not expressly refer to levels of trade.  <u>See</u> Def.'s Mem. at 93-96.  Torrington supports Commerce's position.  <u>See</u> Torrington's Resp. at 35.

D.    **ANALYSIS**

While subsection 1677a(f) does not expressly refer to levels of trade, the statute does refer to the "narrowest category of merchandise . . . which includes the subject merchandise." <u>See</u> 19 U.S.C. §§ 1677a(f)(2)(C)(ii) and (iii).  The term "subject merchandise" is defined as "the class or kind of merchandise that is within the scope of an investigation . . . ."  19 U.S.C. § 1677(25) (1994).  Since the statute envisions that the "narrowest category" will be the class or kind of merchandise that is within the scope of a particular review at issue, Commerce did not read the statutory scheme as contemplating that Commerce would have to consider a much narrower subcategory of merchandise, such as one

based upon an LOT.[11]   See Def.'s Mem. at 95 (relying on SAA, H.R. Doc. 103-316 at 824-25, reprinted in 1994 U.S.C.C.A.N. at 4164, and 19 U.S.C. § 1677a(f)(2)(C)(i)).

While NTN contends that Commerce should calculate CEP profit to account for level-of-trade differences because "[t]here is no reason [for Commerce] to use a less specific, less accurate mode of calculation," NTN's Mem. at 30, a CEP profit calculation based upon a broader profit line than the subject merchandise will not necessarily produce a distorted result.[12]

> No distortion in the profit allocable to U.S. sales is created if total profit is determined on the basis of a broader product-line than the subject merchandise, because the total expenses are also determined on the basis of the same expanded product line. Thus, the larger profit pool is multiplied by a commensurately smaller percentage.

SAA, H.R. Doc. 103-316 at 825, reprinted in 1994 U.S.C.C.A.N. at 4164-65.

Based on the foregoing, the Court upholds Commerce's refusal to calculate CEP profit for NTN on an LOT basis as reasonable.

---

[11] Commerce made it clear that the subdivision of the CEP-profit calculation should be the exception rather than the rule because of additional complexity and susceptibility to manipulation. See Final Rule, 62 Fed. Reg. at 27,354.

[12] Moreover, NTN failed to show the Court that: (1) Commerce actually found multiple LOTs for NTN in the United States market; and (2) the profit calculation was actually distorted by Commerce's methodology.

XIII.      Commerce's Decision to Include Profits from
           EP Sales in the Calculation of CEP Profit

    A.    BACKGROUND

The current antidumping law provides that, in calculating CEP, Commerce must deduct from the price to the first unaffiliated purchaser in the United States "the profit allocated to the expenses described in" 19 U.S.C. §§ 1677a(d)(1) and 1677a(d)(2). 19 U.S.C. § 1677a(d)(3).  The term "profit" is defined as "an amount determined by multiplying the total actual profit by the applicable percentage," 19 U.S.C. § 1677a(f)(1), while the term "actual profit" is defined as the "total profit earned . . . with respect to the sale of the same merchandise for which total expenses are determined."  19 U.S.C. § 1677a(f)(2)(D).  Finally, the term "total expenses" is defined as "all expenses in the first of [three] categories which applies and which are incurred by or on behalf of the foreign producer and foreign exporter of the subject merchandise and by or on behalf of the United States seller affiliated with the producer or exporter with respect to the production and sale of such merchandise . . . ."  19 U.S.C. § 1677a(f)(2)(C).

During the review, Commerce, basing its decision on Commerce's reading of the foregoing provisions, included profit on EP sales in Commerce's calculation of CEP profit.  See Preliminary Results, 63 Fed. Reg. at 6515.

B. CONTENTIONS OF THE PARTIES

NTN contends that the statute expressly provides that the adjustment of profit to the CEP is to be based on expenses incurred in the United States as a percentage of total expenses and that there is no provision in the statute for the inclusion of EP expenses or profit in this calculation. See NTN's Mem. at 30-31. Commerce, however, asserts that Commerce's action was in accordance with the pertinent provisions since

> [t]he basis for total actual profit is the same as the basis for total expenses under [19 U.S.C. § 1677a(f)(2)(c) (1994)]. The first alternative under this section states that, for purposes of determining profit, the term "total expenses" refers to all expenses incurred with respect to the subject merchandise sold in the United States (as well as home-market expenses). Thus, where the respondent makes both EP and CEP sales to the United States, sales of the subject merchandise would encompass all such transactions. Therefore, because NTN had EP sales, [Commerce] ha[s] included these sales in the calculation of CEP profit.

Final Results, 63 Fed. Reg. at 33,345; see also Def.'s Mem. at 98-99.

Torrington supports Commerce's position and points out that Commerce's approach to include EP sales in the calculation of CEP profit was consistent with Commerce's practice. See Torrington's Mem. at 35-37.

C.  **ANALYSIS**

Commerce's September 4, 1997, policy bulletin provides that

> [t]he calculation of total actual profit under [19 U.S.C.
> § 1677a(f)(2)(D)] includes all revenues and expenses
> resulting from the respondent's [EP] sales as well as
> from its constructed export price and home market sales
> . . . .  The basis for total actual profit is the same as
> the basis for total expenses under [19 U.S.C. §
> 1677a(f)(2)(C)].   The first alternative under this
> section . . . states that, for purposes of determining
> profit, the term "total expenses" refers to all expenses
> incurred with respect to the subject merchandise sold in
> the United States (as well as home market expenses).
> Thus, where the respondent makes both EP and CEP [sales],
> sales of the subject merchandise would encompass all such
> transactions.

NTN Bearing Corp. of Am., 26 CIT at ___, 186 F. Supp. 2d at 1272.

> Moreover, the SAA addresses the point and states that

> [t]he total expenses are all expenses incurred by or on
> behalf of the foreign producer and exporter and the
> affiliated seller in the United States with respect to
> the production and sale of the first of the following
> alternatives which applies: (1) the subject merchandise
> sold in the United States and the foreign[-]like product
> sold in the exporting country (if Commerce requested this
> information in order to determine the normal value and
> the constructed export price) . . . .

H.R. DOC. 103-316 at 824, reprinted in 1994 U.S.C.C.A.N. at 4164.

The first category, which Commerce used and upon which NTN
relies, see NTN's Mem. at 30, covers "expenses incurred with
respect to the subject merchandise sold in the United States and
the foreign[-]like product sold in the exporting country . . . ."
19 U.S.C. § 1677a(f)(2)(C)(i).  The term "subject merchandise" is

defined in pertinent part as "the class or kind of merchandise that is within the scope of . . . a review . . . . 19 U.S.C. § 1677(25). Thus, where a respondent makes both EP and CEP sales, "sales of the subject merchandise" could be reasonably interpreted to encompass all such transactions. Consequently, Commerce has interpreted the statutory scheme as providing that the calculation of total actual profit is to include all revenues and expenses resulting from NTN's EP sales as well as from NTN's CEP and home market sales.

Commerce's conclusion was based on the SAA's explanation that the total expenses are all expenses incurred with respect to the production and sale of the first of the three alternatives. See H.R. Doc. 103-316 at 824, reprinted in 1994 U.S.C.C.A.N. at 4164. In referring to the first category of expenses, the SAA specifically refers to "the subject merchandise sold in the United States," which by definition means the class or kind of merchandise which is within the scope of a review and, in this review, included both CEP and EP sales.

NTN asserts that the SAA's reference to constructed export price supports its statutory interpretation that there are only two categories of expenses that Commerce can use in calculating CEP profit: those used to calculate NV and those used to calculate CEP. See NTN's Mem. at 31. NTN, however, fails to observe that the first category of total expenses is not limited to expenses

incurred with respect to CEP sales made in the United States and the foreign-like product sold in the exporting country.  Instead, it also covers expenses incurred with respect to EP sales because it refers to "expenses incurred with respect to the subject merchandise sold in the United States," and the term "subject merchandise" is defined in 19 U.S.C. § 1677(25) as the class or kind of merchandise that is within the scope of a review (in the case at bar, both CEP and EP sales).  NTN similarly fails to take note of the fact that, in referring to the first category of expenses, the SAA specifically refers to "the subject merchandise sold in the United States," which, by definition, means the class or kind of merchandise which is within the scope of a review (in this review, includes both CEP and EP sales).

For these reasons the Court is not convinced by NTN's argument that Commerce's interpretation of the statutory scheme is unreasonable and sustains Commerce's inclusion of EP sales in the calculation of CEP profit.  See Chevron, 467 U.S. 837.


**XIV.**      **Commerce's Decision to Recalculate Home Market Indirect Selling Expenses Without Regard to Levels of Trade**

       **A.**   BACKGROUND

During the review, Torrington asserted that NTN had the burden of proving the relationship between home market LOTs and home market indirect selling expenses.  Since during the POR at issue,

NTN has continued to allocate its indirect selling expenses on the basis of number of employees at certain regions (but omitted to demonstrate that NTN incurred any specific types of expenses that were unique to a particular LOT during the POR at issue) Commerce agreed with Torrington and, upon evaluation of the record, concluded that NTN failed to prove such a relationship. See Def.'s Mem. at 100. Specifically, Commerce observed that

> [t]he method that NTN used to allocate its indirect selling expenses does not bear any relationship to the manner in which NTN incurs the expenses in question, thereby leading to distorted allocations . . . . Therefore, [Commerce] ha[s] allocated NTN's home-market indirect selling expenses over the total sales values, without regard to levels of trade.

Final Results, 63 Fed. Reg. at 33,329.

Explaining its decision, Commerce pointed out that indirect selling expenses are fixed period costs that typically relate to all sales and do not vary according to sales value or the number of employees who allegedly sell each type of merchandise. See id. (citing Final Results of Antidumping Duty Administrative Reviews, Partial Termination of Administrative Reviews, and Revocation in Part of Antidumping Duty Orders of Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From France, et al., 60 Fed. Reg. 10,900, 10,940 (Feb. 28, 1995)).

### B.   CONTENTION OF THE PARTIES

NTN asserts that the record demonstrates that NTN's reporting of indirect selling expenses was in accordance with Commerce's requirements because Commerce: (1) verified that NTN's reported indirect selling expenses are directly traceable to individual cost centers; and (2) tied several of the reported indirect selling expenses to the account total in NTN's financial records.  See NTN's Mem. at 32.   Commerce, however, maintains that, since Commerce's verification merely established that the indirect selling expenses were incurred, Commerce's reallocation of the expenses without regard to LOTs was reasonable.  See Def.'s Mem. at 101.   Torrington supports Commerce's position and argues that Commerce reasonably allocated NTN's indirect selling expenses over total home market sales without regard to LOTs.  See Torrington's Mem. at 38.

### C.   ANALYSIS

The Court agrees with Commerce.  The fact that Commerce found different LOTs in the United States and in the home market, and granted NTN an LOT adjustment in the situations where Commerce found such adjustment proper, does not necessarily lead to a conclusion that Commerce's reallocation of the expenses without regard to LOTs was entirely unreasonable.  It is undisputed that NTN had the burden of demonstrating that there was a relationship

between NTN's allocation of the expenses and the manner in which they were incurred, and NTN's reference to Commerce's other actions that availed NTN to an LOT adjustment cannot per se satisfy this burden.  Accord NTN Bearing Corp. of Am., 24 CIT at ___, 104 F. Supp. 2d at 133; NTN Bearing Corp. of Am. v. United States, 23 CIT 486, 496, 83 F. Supp. 2d 1281, 1290 (1999); NTN Bearing Corp. of Am., 19 CIT at 1233-35, 905 F. Supp. at 1094-95.  Therefore, Commerce's decision to recalculate NTN's home market indirect selling expenses without regard to LOTs is affirmed.


**XV.    Commerce's Decision to Accept Koyo's Home Market
        Lump Sum Billing Adjustments and Rebates, NSK's
        Home Market Billing Adjustments, and NTN's Home
        Market Discounts as Direct Adjustments to Price**

   **A.    BACKGROUND**

   This issue largely turns on the interpretation of the CAFC's decision in Torrington Co. v. United States ("Torrington"), 82 F.3d 1039 (Fed. Cir. 1996).  Specifically, the question is whether Torrington, 82 F.3d 1039, can be interpreted as being for or against the proposition that "direct" price adjustments may only be accepted when they are reported on a transaction-specific basis.

   While the court in Torrington, 82 F.3d at 1047-51, overturned Commerce's particular practice of treating certain allocated price adjustments as indirect expenses pursuant to the export sale price offset under 19 C.F.R. § 353.56(b)(2) (which authorized

Commerce to make a reasonable deduction from FMV for all expenses incurred in selling such or similar merchandise other than those described in the pertinent parts of 19 C.F.R. § 353.56), the CAFC did not address the issue of whether "direct" price adjustments may only be accepted when they are reported on a transaction-specific basis. The CAFC further explained that "the question to be determined is whether Commerce's treatment" of the adjustments at issue "as expenses that are not 'those described in [pertinent parts of the regulation' are] plainly erroneous or inconsistent with 19 C.F.R. § 353.56." Torrington, 82 F.3d at 1050. "The expenses 'described in [pertinent parts of the regulation]' are direct selling expenses." Id. (quoting Sharp Corp. v. United States, 63 F.3d 1092, 1096 (Fed. Cir. 1995)). "Thus, under the regulation, direct selling expenses are not eligible for ESP offset treatment." Id. (citing 19 C.F.R. § 353.56). Because the adjustments at issue represented expenses related to a particular sale, or sales, and varied with the quantity of the particular item, they constituted direct selling expenses, as defined in Zenith Elecs. Corp. v. United States, 77 F.3d 426, 431 (Fed. Cir. 1996), and Torrington Co., 68 F.3d at 1353. See Torrington, 82 F.3d at 1050. Accordingly, Commerce read Torrington, 82 F.3d at 1050, to mean that the CAFC

> held that [Commerce] could not make an adjustment for post-sale price adjustments (["]PSPAs["]) as indirect selling expenses (under the exporter's sale price-offset regulation) when the PSPAs were related directly to the

transactions in question. While the [CAFC] held that the method of allocating or reporting an expense does not alter the relationship between the expense and the related sales . . . , the Court did not indicate that allocations of direct expenses were impermissible.

Final Results, 63 Fed. Reg. at 33,325.


Subsequently, Commerce addressed the issue in Final Rule, 62 Fed. Reg. at 27,347, stating that,

[i]n . . . regard [with the issue], [Commerce] received several comments that addressed the relevance of Torrington v. United States, 82 F.3d 1039 . . . , to the allocation of price adjustments. In that case, although the [CAFC] appeared to question whether price adjustments constituted expenses at all, . . . , it held that assuming that the price adjustments in question were expenses, they had to be treated as direct selling expenses rather than indirect selling expenses. According to the [CAFC], "[t]he allocation of expenses . . . does not alter the relationship between the expenses and the sales under consideration." [Torrington, 82 F.3d] at 1051.

    In [Commerce's] view, [Torrington, 82 F.3d 1039] is of limited relevance to the instant issue, because the [CAFC] did not address the propriety of the allocation methods used in reporting the price adjustments in question. Instead, it simply stated that regardless of the allocation methods used, [Commerce] could not treat the price adjustments as indirect selling expenses. Moreover, these regulations are consistent with the holding of the case, because, by distinguishing price adjustments from expenses, [Commerce] ha[s] ensured that [Commerce] will not treat price adjustments as any selling expenses, including indirect selling expenses.


In sum, Commerce views Torrington, 82 F.3d 1039, to stand solely for the proposition that Commerce cannot treat "improperly" allocated price adjustments (that is, price adjustments that, because of the manner in which they were allocated, did not qualify

for direct selling expenses adjustment) as indirect selling
expenses.

> In accordance with the CAFC's decision in [Torrington, 82
> F.3d 1039], [Commerce] ha[s] not treated improperly
> allocated [home market] price adjustments as [indirect
> selling expenses], but instead ha[s] disallowed negative
> (downward) adjustments in their entirety. [Commerce]
> ha[s] included positive (upward) [home market] price
> adjustments (e.g., positive billing adjustments that
> increase the final sales price) in [Commerce's] analysis.

Final Results of Antidumping Duty Administrative Reviews and
Partial Termination of Administrative Reviews of Antifriction
Bearings (Other Than Tapered Roller Bearings) and Parts Thereof
From France, Germany, Italy, Japan, Singapore, Sweden, and the
United Kingdom, 61 Fed. Reg. 66,472, 66,498 (Dec. 17, 1996); accord
NSK Ltd., 21 CIT at 622, 969 F. Supp. at 43.

Moreover, neither the pre-URAA nor the post-URAA statutory
scheme imposes standards establishing the circumstances under which
Commerce is to grant or deny adjustments to NV for PSPAs, or to be
bound by a particular methodology. See Torrington Co., 82 F.3d at
1048; Koyo Seiko Co. v. United States, 16 CIT 539, 542, 796 F.
Supp. 1526, 1530 (1992). Consequently, Commerce does not decline
to consider information submitted by an interested party if that
information is necessary to the determination but does not meet all
of Commerce's established requirements, as long as the following
criteria are met: (1) the information is submitted by the
established deadline; (2) the information can be verified; (3) the

information is sufficiently complete to serve as a reliable basis for reaching the applicable determination; (4) the interested party has demonstrated that it acted to the best of its ability in providing the information and meeting the requirements established by Commerce; and (5) the information can be used without undue difficulties.   See 19 U.S.C. § 1677m(e) (1994); Timken Co. v. United States, 22 CIT 621, 628, 16 F. Supp. 2d 1102, 1108 (1998) (stating that Commerce is delegated with the authority to tailor the methodology in accordance with the particular needs and abilities of the regulated industry).


### B.   CONTENTIONS OF THE PARTIES

Torrington recognizes that Commerce's new practice allowed a more flexible response, reflecting the more lenient statutory instructions of subsection 1677m(e). See generally, Torrington's Mem. Rule 56.2 Mot. J. Agency R. ("Torrington's Rule 56.2 Mem.") at 16-23. Torrington, however, asserts that since: (1) Section 1677m(e) does not affect Commerce's fundamental policy of putting the burden of proof with the party who intends to benefit from the claim made; and (2) the new law did not alter the definition of direct adjustments, Commerce erred in its decision to accept certain Koyo, NSK and NTN's billing adjustments and rebates. See id. at 16-34.

Commerce maintains that Commerce's actions were: (1) in accordance with the mandate of 19 U.S.C. § 1677m(e); (2) Commerce's authority to tailor the necessary methodology; and (3) inapposite to the holding of Torrington, 82 F.3d 1039. See Def.'s Mem. at 109-19. Koyo, NTN and NSK support Commerce's position. See generally, Mem. Def.-Intervenor[] Koyo['s] Resp. Torrington's Mot. J. Agency R.; Resp. NTN['s] Torrington's June 10, 1999, 56.2 Mot. J. Agency R.; Mem. NSK['s] Opp'n Torrington's Rule 56.2 Mot. J. Agency R.

**C.    ANALYSIS**

**1.    COMMERCE'S TREATMENT OF KOYO'S LUMP SUM BILLING ADJUSTMENTS**

In accordance with its stated policy for analyzing price adjustments under the new provisions of the antidumping statute, Commerce reviewed Koyo's reported home market lump sum billing adjustments, the so-called billing adjustment number two. See Final Results, 63 Fed. Reg. at 33,328. Following its previous practice, Commerce concluded that Koyo: (1) had reported the adjustments on the most specific basis possible to Koyo and, thus, had cooperated with Commerce to the best of Koyo's ability;[13] and

---

[13]    In response to Commerce's questionnaire, Koyo reported that these adjustments included both, the adjustments that were granted to customers on a model-specific basis as well as the adjustments that were the result of negotiations between Koyo and its customers. These adjustments were not granted on a model-

(2) did not use the allocation method that was distortive.[14]  <u>See</u>

---

... cont.

specific basis, but, rather, as a single lump sum.  Because these
adjustments were maintained in Koyo's computer system on a
customer-specific basis, for purposes of the response, Koyo
calculated customer-specific lump sum factors by multiplying the
total amount of credit notes (if any) issued to a customer during
the POR (excluding notes issued for rebate) by the ratio of Koyo's
sales to the customer to Koyo's total sales to the customer during
the POR.  The resulting subject product credit note amount was then
divided by the amount of sales of the pertinent items to the
customer during the POR, to arrive at a price-per-unit amount.

Koyo provided detailed worksheets of this calculation which
showed the total amount of POR sales of all items to each customer,
the total amount of sales of particular type of items to each
customer and the total amount of the lump sum adjustment granted to
the customer during the POR.  Koyo explained that it had  no means
to identify by computer the specific transactions to which the
billing adjustments applied. The only means by which Koyo could tie
the adjustments to specific transactions would be to go through the
paperwork for each of the billing adjustments manually, to identify
the details of the underlying negotiations.  Due to the enormous
size of Koyo's sales database (involving hundreds of thousands of
transactions) and the large number of billing adjustments
(involving thousands of adjustments), the search and pooling
process is done by electronic means, using the same customer codes.

[14] Commerce concluded that

[w]ith respect to the second billing adjustment,
[Commerce] ha[s] determined that Koyo has reported it to
the best of its ability.  [Commerce] ha[s] based our
determination on the fact that this PSPA is comprised of
two types of adjustments, including both lump-sum
adjustments negotiated with customers without reference
to model-specific prices and also adjustments granted on
a model-specific basis, but which Koyo records in its
computer system on a customer-specific basis only. Given
the large number of sales involved, it is not feasible to
report this on a more specific basis.  . . .  Moreover,
there is no information on the record which indicates
that the bearings included in Koyo's . . . allocation

id.; accord Timken, 22 CIT at 626, 16 F. Supp. 2d at 1008.

Torrington notes that, since Koyo was able to report its adjustment number one on a transaction-specific basis, see Torrington's Rule 56.2 Mem. at 6-8, Koyo had sufficient time to modify its accounting system to generate the appropriate information with respect to number two adjustments. However, Commerce is not required to disallow the adjustment merely because Torrington offers a speculation about Koyo's processing abilities. Indeed, it is Commerce and not Torrington that is charged with the authority to draw on its experience and evaluate the processing abilities of a respondent.

Alternatively, Torrington argues that the adjustments should not have been accepted because the size of the adjustments affected the dumping margins. See id. at 8. However, the very reason why such adjustments were taken into account by Commerce altogether is that dumping margins had to be calculated by Commerce as accurately as possible in view of the particular circumstances of the case.

_____

... cont.

> vary significantly in terms of value, physical characteristics or the manner in which they are sold such that Koyo's allocations would result in unreasonably inaccurate or distortive allocations. Therefore, [Commerce] ha[s] allowed Koyo's lump sum-adjustments as direct adjustments to normal value.

Final Results 63 Fed. Reg. at 33,328.

See Def.'s Mem. at 113-14.

Furthermore, Torrington argues that Commerce "unlawfully imposed on [Torrington] an affirmative burden of showing distortion." Torrington's Rule 56.2 Mem. at 8. However, in fact, Commerce expressly required Koyo to demonstrate that Koyo's allocation methodology for all non-subject merchandise for which Koyo made billing adjustments was not unreasonably distortive. Moreover, Commerce did not impose any burden upon Torrington when Commerce stated that it "found no support for the proposition that the bearings included in Koyo's allocation vary significantly in terms of value, physical characteristics, or the manner in which they are sold such that Koyo's allocation would result in an unreasonably inaccurate or distortive allocation." Final Results, 63 Fed. Reg. at 33,327. Therefore, the Court is not convinced by Torrington's argument and affirms Commerce's decision.

### 2. COMMERCE'S TREATMENT OF NSK'S LUMP SUM BILLING ADJUSTMENTS

During the POR at issue, NSK: (1) granted home market lump sum billing adjustments on a customer-specific basis and not on transaction-specific or part-number-specific basis; and, therefore, (2) created accounting records that (a) merely recorded a lump sum adjustment to a particular customer's account; and (b) did not allow NSK to link the adjustment to specific sales or products, or

to report the adjustment more precisely than on a customer-specific basis. See Torrington's Rule 56.2 Mem. at 8-11. During the process of verification, Commerce verified the adjustment by examining debit and credit memoranda from NSK to its customers and found that the amount of the increase or decrease was recorded as an offset in NSK's accounts receivable ledger. See Def.'s Mem. at 115. Torrington, however, asserts that NSK could have reported at least some of the adjustments more precisely. See Torrington's Rule 56.2 Mem. at 8-11. However, it is Commerce and not Torrington that is charged with the authority to use its expertise and knowledge of the reporting systems of a particular respondent. In other words, the fact that NSK's accounting records merely recorded a lump sum adjustment to the customer's account receivable does not make Commerce's conclusion that NSK could not link the adjustment to specific sales or products, or to report the adjustment more precisely than on a customer-specific basis unreasonable. Commerce could rightfully conclude that

> [a]lthough NSK allocated lump-sum price adjustments on a customer-specific basis, [Commerce] determined that NSK acted to the best of it ability in reporting this information when it used customer-specific allocations.
>
> [Commerce's] review of the information which NSK submitted indicates that, given the lump-sum nature of this adjustment, the fact that NSK's records do not readily identify a discrete group of sales to which each rebate pertains, and the extremely large number of sales NSK made during the POR, it is not feasible for NSK to

report this adjustment on a more specific basis.[15]

Final Results, 63 Fed. Reg. at 33,327.


### 3.    COMMERCE'S TREATMENT OF NTN'S HOME MARKET DISCOUNTS

During the review at issue, Commerce verified that NTN granted lump-sum discounts that were calculated on a customer-specific category as well as product-specific category basis.   See Def.'s Mem. at 117.   Commerce determined that NTN maintained a discount table for the purpose of detecting the product category of the merchandise. See id. Using this discount table, NTN could isolate the discount granted with respect to subject merchandise.   See id. Commerce verified that, to determine the discount granted and reported in NTN's home market sales listing, NTN calculated a discount ratio that was based upon the total amount of discounts granted to a customer during the POR divided by the value of sales made to that customer during the POR.   See id.   This discount ratio was then multiplied by the gross unit price which yielded the discount amount reported in NTN's home market sales listing.  See id.   Because the discounts were not granted on a transaction-specific basis, Commerce concluded that NTN reported the discounts

---

[15] Torrington also argues that: (1) the adjustments should not have been accepted because the size of the adjustments affected the dumping margins; and (2) Commerce unlawfully shifted the burden of proof to Torrington.  These arguments are addressed by the Court with respect to Koyo's lump sum adjustments, supra, and the Court adheres to its prior reasoning.

in the most feasible manner possible.  See Final Results, 63 Fed.
Reg. at 33,325.

Torrington argues that NTN did not demonstrate that NTN's
allocation methodology was non-distortive.  See Torrington's Rule
56.2 Mem. at 11-12.  However, after examining the record, Commerce
found that, because NTN's allocation was order-specific, and the
merchandise did not vary significantly in terms of value, physical
characteristics, or the manner in which it was sold, the results of
the allocation were not unreasonably inaccurate or distortive.[16]
See Final Results, 63 Fed. Reg. at 33,325.  As this Court pointed
out supra, the agency and not Torrington is charged with the
authority to determine whether reported data leads to a distortive
result.  Therefore, Commerce's decision with respect to NTN's home
market discounts is affirmed.

### 4.    COMMERCE'S TREATMENT OF KOYO'S HOME MARKET REBATES

During the review, Koyo: (1) reported that it granted home
market rebates to a certain distributor; but (2) could not identify
from its records the individual models on which the rebate was

---

[16] Torrington also argues that: (1) the adjustments should not
have been accepted because the size of the adjustments affected the
dumping margins; and (2) Commerce unlawfully shifted the burden of
proof to Torrington.  These arguments are addressed by the Court
with respect to Koyo's lump sum adjustments, supra, and the Court
adheres to its prior reasoning.

granted without reviewing manually hundreds of individual invoices.
See Def.'s Mem. at 118.  Since Koyo was unable to perform the
latter function, Koyo reported rebates to this distributor on the
basis of the distributor's account as a whole.[17]  See id.  Commerce
concluded that, since Koyo did not have the capability in its
computerized record-keeping system to distinguish between sales to
the distributor for a specific application covered by the rebate
and sales to the same distributor sold for different applications
that were not covered by the rebate, Koyo had reported this rebate
on as a specific basis as possible.  See Final Results, 63 Fed.
Reg. at 33,327.

Torrington asserts that Koyo should have been able to obtain
more precise data, and that Koyo has had ample time to modify its
record-keeping system.  See Torrington's Rule 56.2 at 13-14.
However, Torrington's speculations do not provide neither a factual
nor a legal basis to the statement that Commerce's determination
was unreasonable.  Therefore, the Court upholds Commerce's
treatment of Koyo's home market rebates.

---

[17] Specifically, the reported rebate amounts in the home market
sales to that distributor were based on a factor calculated by
dividing the total rebate payments made to that distributor during
the POR by the total sales made to that distributor during the POR.
See Def.'s Mem. at 118.

**CONCLUSION**

In accordance with the foregoing opinion, this case is remanded to Commerce: (1) to determine whether NSK's cylindrical roller bearings at issue are (a) complex merchandise that encompasses characteristics so numerous that the process of valuation shall be entrusted to Commerce's discretion, or (b) merchandise that can be matched in accordance with the statutorily provided hierarchy; and (c) if Commerce concludes that NSK's cylindrical roller bearings are merchandise that could be matched in accordance with the statutorily provided hierarchy, change Final Results, 63 Fed. Reg. 33,320, accordingly; and (2) with regard to NTN's minor inputs, to (a) either provide the Court with a sufficient and reasonable explanation of Commerce's methodology; or (b) if Commerce is unable to do so, amend Final Results, 63 Fed. Reg. 33,320, accordingly. Commerce's final determination is affirmed in all other respects.

_____
NICHOLAS TSOUCALAS
SENIOR JUDGE

Dated:　　July 8, 2002
　　　　　New York, New York